11-3756 (L)
United States v. Cuti

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2012

(Argued: October 25, 2012    Decided: June 26, 2013)

Docket Nos. 11-3756, 11-3831

----------------------------------------x

UNITED STATES OF AMERICA,

     Appellee,

                   -- v. --

ANTHONY CUTI, WILLIAM TENNANT,

     Defendants-Appellants.

----------------------------------------x

B e f o r e :  JACOBS, Chief Judge, WALKER, Circuit Judge, and
O'CONNOR, Associate Justice (retired).[*]

Defendants-Appellants Anthony Cuti and William Tennant, former executives of the retail drugstore chain Duane Reade, appeal their convictions for securities fraud in the District Court for the Southern District of New York (Batts, J.).  Cuti and Tennant arranged fraudulent transactions to inflate Duane Reade's reported earnings in SEC filings.  Among the issues raised on appeal by Cuti is the admission of non-expert witness testimony as to what the accounting treatment of the transactions would have been absent the fraud.  Tennant asserts primarily that the jury lacked sufficient evidence to convict him and that the district court had no basis to

---

[*]    The Honorable Sandra Day O'Connor, Associate Justice (retired) of the United States Supreme Court, sitting by designation.

give a conscious avoidance instruction. We conclude that the district court did not abuse its discretion in admitting the lay witness testimony and that Tennant's claims are without merit. Affirmed.

BRIAN C. BROOK, Clinton Brook & Peed (Matthew J. Peed, Clinton Brook & Peed, and Brian D. Waller, Simon & Partners, LLP, on the brief), New York, NY, for Defendant-Appellant Anthony Cuti.

JOHN J. KENNEY (Laura B. Hoguet, Tai-Heng Cheng, Caitlin N. Bush, Damian R. Cavaleri, on the brief), Hoguet Newman Regal & Kenney, LLP, New York, NY, for Defendant-Appellant William Tennant.

SARAH E. MCCALLUM (Rebecca Monck Ricigliano, Katherine Polk Failla, on the brief), Assistant United States Attorneys, for Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, for Appellee.

JOHN M. WALKER, JR., Circuit Judge:

Defendants-Appellants Anthony Cuti and William Tennant appeal from judgments of conviction following a jury trial in the District Court for the Southern District of New York (Deborah A. Batts, Judge).[1] This opinion addresses Cuti's claim that the district

---

[1] Cuti was convicted of conspiracy under 18 U.S.C. § 371 (Count One) and substantive offenses of securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5 and 18 U.S.C. § 2 (Count 2), making false statements in two SEC filings in violation of 15 U.S.C. §§ 78m(a) & 78ff, 17 C.F.R. § 240.13a-1 and 18 U.S.C. § 2 (Counts 3 and 4), and making false statements in another SEC filing in violation of 15 U.S.C. §§ 78o(d) & 78ff, 17 C.F.R.

court erred in admitting testimony from two lay witnesses as to what the accounting treatment of certain fraudulent transactions would have been absent the fraud, and Tennant's claims that his conviction should be overturned for insufficient evidence to prove his knowledge of the fraud and that it was error for the district court to give a conscious avoidance jury instruction.  We conclude that the district court did not abuse its discretion in admitting the testimony of the non-expert witnesses and that Tennant's claims are without merit.[2]  AFFIRMED.

## BACKGROUND

Cuti was the former president, chief executive officer, and board chairman of Duane Reade, a retail drugstore chain in the New York City metropolitan area.  Tennant was Duane Reade's former chief financial officer or CFO and senior vice-president, who continued to consult for the company on real estate matters after his formal retirement.

The trial evidence, which we take as credited by the jury, showed that from 2000 to 2004, Cuti and Tennant (collectively, "defendants") executed a number of schemes to inflate the company's

§§ 240.15d-1 & d-13 (Count 5).  Tennant was acquitted on Count 1 and convicted on Count 2.  The district court sentenced Cuti and Tennant principally to imprisonment for three years and time served, respectively, and imposed fines of $5 million on Cuti and $10,000 on Tennant.

[2]   The appellants' other arguments on appeal are addressed in a summary order issued simultaneously with this opinion.

earnings in quarterly and annual financial statements filed with the Securities and Exchange Commission ("SEC").

The principal scheme consisted of the fraudulent sale of real estate concessions and other rights that Duane Reade held in its storefront leases. When Duane Reade vacated a storefront with an unexpired lease, the right to the remainder of the lease term could have residual value and be sold back to the landlord or to a broker, especially when rental rates had risen. Cuti and Tennant, however, inflated earnings by fraudulently selling real estate concessions that were virtually worthless and surreptitiously repaying the purchasers through payments disguised as expenses.

Cuti and Tennant's primary counterparty to the transactions in this scheme was the Winick Realty Group ("Winick Realty"), a commercial real estate brokerage firm and its subsidiaries (collectively, the "WRG entities"). At trial, Cory Zelnik, a partner at Winick Realty, testified that in 2000, the WRG entities paid $806,000 for concessions in eight leases that Duane Reade had already sold, assigned away or planned to abandon and another $890,000 for options to buy out Duane Reade from three leases that were of minimal value to Winick Realty. The defendants repaid the WRG entities for these outlays using a sham consulting agreement and padded brokerage fees. The revenue immediately recognized from these transactions helped Duane Reade bridge a gap between its true earnings and analysts' expectations for the fourth quarter of 2000.

In subsequent quarters, the defendants continued to arrange other sham transactions to inflate company earnings and to repay the counterparties.

Because Duane Reade recognized such significant income from these activities, its external auditor, PricewaterhouseCoopers ("PwC"), required the company to include in its financial statements filed with the SEC, a note stating that the company had no side agreements with or other obligations to the transaction counterparties. At trial, the government produced evidence of side agreements and demonstrated, through witness testimony and voluminous documentation, how the defendants executed and concealed their fraudulent conduct from the company's internal accountants, PwC, the SEC, and the investing public.

As part of its case, the government called Kevin Hallinan, the PwC partner who was Duane Reade's lead outside auditor, and John Henry, Tennant's successor as CFO and the company's chief in-house accountant, to testify as to how they had accounted for the proceeds from the fraudulent transactions; how they would have accounted for the transactions had they been aware of the full facts; and how the material information that was withheld from them led to misstatements in the company's financial statements.

The rules governing the accounting of real estate concession transactions, as Hallinan and Henry explained, are set forth under generally accepted accounting principles ("GAAP") including

Financial Accounting Standards Board Statement No. 13 and SEC Staff Accounting Bulletin No. 104. In order for revenue generated from such a transaction to be recognized immediately, (1) Duane Reade had to have negotiated with the counterparty at arms' length, (2) the transaction must have had value, (3) to the extent the transaction relieved Duane Reade of its obligations under a lease agreement, the company could not be committed to enter into another lease with the same landlord, and (4) the transaction could not create any further obligations for Duane Reade to perform. If any of the foregoing criteria were not satisfied, immediate revenue recognition would have been inappropriate. Both the company's internal accountants and outside auditors adhered to these rules in booking revenue from real estate concession transactions. At trial, the defendants did not dispute that these rules were appropriately and consistently applied.

To demonstrate the impact of the defendants' deception on the preparation and review of the company's financial statements, the government presented Hallinan and Henry with information that Cuti and Tennant had withheld, such as side letters to the transactions, and asked how the withheld information would have affected their accounting. In each instance, Hallinan and Henry replied that if they had been aware of the withheld information, they would not have recognized the full amount of the transaction proceeds as immediate revenue. Defense counsel objected to the use of "what-

6

if-you-had-known" questions as eliciting inadmissible expert opinion testimony from fact witnesses.

In his defense, Tennant asserted that, like Hallinan and Henry, he too was deceived by Cuti's fraudulent scheme and signed transaction documents without knowing that fraud was afoot so there was insufficient evidence of his criminal intent to support a conviction. He also objected to the district court's inclusion of a conscious avoidance instruction in the jury charge, which he claimed was unwarranted and prejudicial.

These arguments are again raised on appeal and we consider them in turn.

**DISCUSSION**

**I.  Cuti's claim as to the non-expert testimony**

Cuti argues on appeal, as he did below, that the "what-if-you-had-known" questions posed to Hallinan and Henry improperly elicited expert opinion testimony from non-expert witnesses. Because both Hallinan and Henry, while professional accountants, were not qualified as experts, Cuti insists that their testimony as lay witnesses was inadmissible.

We accord a district court's evidentiary rulings deference, and reverse only for abuse of discretion. United States v. Robinson, 702 F.3d 22, 36 (2d Cir. 2012). A district court has abused its discretion if its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or

7

if its decision cannot be located within the range of permissible decisions.  In re Sims, 534 F.3d 117, 132 (2d Cir. 2008).

The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge, see Fed. R. Evid. 602,[3] while opinion testimony can be presented by either a lay or expert witness, see Fed. R. Evid. 701[4] & 702.[5]  The initial question is therefore whether the contested testimony should be characterized as fact or opinion.  "[T]he distinction between statements of fact and opinion is, at best, one of degree." Beech

---

[3] Rule 602 provides in relevant part:

A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.

[4] Rule 701 states:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception;(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

[5] Rule 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Aircraft Corp. v. Rainey, 488 U.S. 153, 168 (1988). We need not adopt verbatim Judge Posner's observation that "[a]ll knowledge is inferential, and the combined effect of [Federal] Rules [of Evidence] 602 and 701 is to recognize this epistemological verity but at the same time to prevent the piling of inference upon inference to the point where testimony ceases to be reliable" to acknowledge its essential truth. United States v. Giovannetti, 919 F.2d 1223, 1226 (7th Cir. 1990).

In this case, the inference that Hallinan and Henry were asked to make in answering the hypothetical questions was limited by the factual foundation laid in earlier admitted testimony and exhibits, the factual nature of the hypotheticals, and the witnesses' reasoning, which was based on undisputed accounting rules. These limitations left little room for the witnesses to engage in speculation and ensured that their testimony fell near the fact end of the fact-opinion spectrum.

Moreover, the witnesses, although not qualified as experts, were fact witnesses of a unique sort. Each was a certified and experienced accountant personally familiar with the accounting of the transactions at issue. The hypothetical questions utilized facts that had been independently established in the record. If the facts as the witnesses had understood them were *A* and the true facts were *B*, it was not inappropriate to ascertain, from the very witnesses responsible for their accounting, whether *B* would have

9

affected that accounting under the same, undisputed accounting rules. And, since the applicable accounting rules were explained in detail, the reasoning process that the witnesses employed in answering the hypotheticals was straightforward and transparent to the jurors, who could readily discern whether the responses given were reliable.

Cuti also contests whether the witnesses had sufficient personal knowledge, as required by Rule 602, to provide factual testimony. See Fed. R. Evid. 602. This rule makes personal knowledge a foundational requirement for fact witness testimony and is premised on the common law belief that "a witness who testifies to a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact." Fed. R. Evid. 602 advisory committee's note.

However, personal knowledge of a fact "is not an absolute" to Rule 602's foundational requirement, which "may consist of what the witness thinks he knows from personal perception." Id. Similarly, a witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior. As this case illustrates, "what-if-you-had-known" questions that present withheld facts to a witness are especially useful to elicit testimony about the impact of fraud. Although we have not addressed the issue squarely, other circuits have permitted the use of hypothetical questions to

10

inquire into the effect of a fraud. See, e.g., United States v. Orr, 692 F.3d 1079, 1096-97 (10th Cir. 2012); United States v. Laurienti, 611 F.3d 530, 549 (9th Cir. 2010); United States v. Jennings, 487 F.3d 564, 582 (8th Cir. 2007); United States v. Ranney, 719 F.2d 1183, 1187-88 (1st Cir. 1983); United States v. Bush, 522 F.2d 641, 649-50 (7th Cir. 1975).

It also bears noting that there was nothing in the prosecution's questions or in the answers they elicited that prevented the defense from challenging the factual accuracy of the disputed testimony. Indeed, Cuti pointed out at trial that at least one document Hallinan claimed not to have seen was actually recorded in a log of documents covered by PwC's audit, and thus Cuti was able to argue that the auditor could not have been deceived about the accounting for that transaction. Cuti also questioned the materiality of the accounting distortions to the company's overall financial statement by extracting an admission from Hallinan that the fair comparison for the proceeds generated from the real estate concession transactions was to the company's pre-tax income and not to the considerably smaller after-tax net income figure.

While we hold that the challenged testimony was properly admitted as factual testimony, we alternatively hold that it is admissible as lay opinion under Federal Rule of Evidence 701, which permits a lay witness to give an opinion if it is limited to "one

11

that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Cuti argues that the hypothetical questions posed to the witnesses violated each subsection of Rule 701 because Hallinan and Henry were asked to comment on facts that they had not personally perceived; because their interpretation of evidence already admitted was not "helpful" to the jury; and because the witnesses used specialized expertise and were not properly qualified as experts in accordance with Rule 702.

Cuti's Rule 701(a) objection is unpersuasive because, as discussed earlier, the witnesses were not testifying to the existence of facts, but simply acknowledging that knowledge of such facts, already admitted into evidence, would have caused them to alter their accounting treatment. Their testimony was plainly helpful to the jury within the meaning of Rule 701(b).

Cuti's Rule 701(c) contention also fails but requires a bit more elaboration. The Advisory Committee's Note on Rule 701 instructs that "a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid.

12

701 advisory committee's note, 2000 amend. Lay opinion under Rule 701 must be limited to opinions that "result[] from a process of reasoning familiar in everyday life." Id.

Cuti insists that if Hallinan and Henry's answers to the hypotheticals are characterized as opinion, they are necessarily expert opinion and must satisfy the qualification requirements of Rule 702 because the testimony involved the technical and specialized knowledge of the accounting profession. At first blush, the accounting rules involved in the recognition of revenue from real estate concession transactions appear technical and unfamiliar to everyday life, but those rules or their interpretation were not in question in this case. The only issue was whether the withheld facts would have altered the rules' application.

We held in Bank of China, N.Y. Branch v. NBM LLC that a witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony "expert" as long as the testimony was based on his "investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise." 359 F.3d 171, 181 (2d Cir. 2004). However, if the testimony was "not a product of his investigation, but rather reflected [his] specialized knowledge [of the banking industry]," then it was impermissible expert testimony. Id. at 182.

A similar question arose in United States v. Rigas, 490 F.3d

13

208 (2d Cir. 2007). There, an accountant with personal knowledge of a company's books testified to the accounting impact of debt reclassifications, which the government had already established as fraudulent. We held that the accountant's testimony was lay opinion because it did not address what the appropriate accounting technique should have been, but was instead simply offered to show what the amount of the debt would have been had the fraud not occurred. Id. at 225.

The testimony in this case was not "rooted exclusively [in the witness's] expertise" and did not address the soundness of the accounting rules. When the issue for the fact-finder's determination is reduced to impact -- whether a witness would have acted differently if he had been aware of additional information -- the witness so testifying is engaged in "a process of reasoning familiar in everyday life." See Fed. R. Evid. 701 advisory committee's note, 2000 amend. The testimony of Hallinan and Henry in response to the hypothetical questions was therefore also admissible as lay opinion.

United States v. Garcia, 413 F.3d 201, 216 (2d Cir. 2005), is not to the contrary. In that case, we held that an undercover law enforcement agent could not testify as lay opinion that, based on his knowledge gleaned from other drug interdiction cases, the defendant was a partner in the narcotics distribution conspiracy. Such testimony was inadmissible because the opinion was based on

14

specialized experience that the agent had accumulated from other cases and involved a specialized reasoning process not readily understandable to the average juror. Nothing similar occurred here. These witnesses testified based only on their experiences with matters pertinent to this case, and their reasoning was evident to the jury.

Cuti also challenges the admission of the contested testimony as undermining the presumption of innocence by assuming his guilt. In support of this argument, Cuti highlights Second Circuit case law that forbids such questions in the cross-examination of defense character witnesses. See, e.g., United States v. Russo, 110 F.3d 948, 952 (2d Cir. 1997); United States v. Oshatz, 912 F.2d 534, 539 (2d Cir. 1990).

This argument fails because the challenged questions here were not directed at character witnesses and made no assumption of guilt. Hallinan and Henry were asked, for the most part, narrow questions on direct examination designed to assess the impact of the fraudulent omissions on their accounting treatment. The district court took pains to limit the hypotheticals to the impact of the withheld information and barred the witnesses from speaking to the wrongfulness of the defendants' actions, leaving that analysis to the jury. And, as noted, Cuti had ample opportunity to challenge the factual accuracy of the disputed testimony.

Finally, Cuti argues that the manner in which the government

presented the withheld information to the witnesses was flawed because some questions were open-ended, some were phrased in terms of opinion, and some were based on material not in the record. The district court reasonably required the government to reformulate its questions in some instances, but it did not always do so. We have examined the record and find any missteps in this regard to be minor relative to the witnesses' entire testimony and harmless to the outcome of the trial. When a court, upon review of the entire record, "is sure that the [evidentiary] error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." Kotteakos v. United States, 328 U.S. 750, 764 (1946).

In sum, we hold that under these circumstances the contested testimony was admissible fact testimony that was relevant, probative, and—for the most part—carefully controlled so as not to be unfairly prejudicial. See Fed. R. Evid. 401, 403 & 602. Alternatively, it was admissible as lay opinion testimony. See Fed. R. Evid. 701. The district court did not abuse its discretion in admitting the challenged testimony.

## II. Tennant's claims

### A. Sufficiency of evidence

Tennant argues that, even though he signed the various documents used to effectuate the fraudulent real estate concession transactions and return-trip payments disguised as commissions and consulting fees and engaged in other related activities, there was

16

insufficient evidence that he knew or should have known that fraud was afoot to allow the case to go to the jury.

We review a claim of insufficient evidence de novo, United States v. Geibel, 369 F.3d 682, 689 (2d Cir. 2004), but must uphold the jury verdict if "drawing all inferences in favor of the prosecution and viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Santos, 449 F.3d 93, 102 (2d Cir. 2005) (quotation marks omitted). A defendant challenging a conviction on sufficiency grounds undertakes a "heavy burden." United States v. Kozeny, 667 F.3d 122, 139 (2d Cir. 2011). A judgment of acquittal can be entered "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004). In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." United States v. Temple, 447 F.3d 130, 137 (2d Cir. 2006)(quotation marks and alteration omitted).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light most favorable to the Government. Id. at 136-37. To "avoid usurping the role of the jury," United States v. Guadagna, 183 F.3d 122, 129

17

(2d. Cir. 1999), the Court must resolve all issues of credibility in favor of the jury's verdict, Kozeny, 667 F.3d at 139. The Court must also "credit[] every inference that the jury might have drawn in favor of the government," Temple, 447 F.3d at 136-37, because "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court." United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001).

Tennant argues that evidence of his knowledge of the fraud is insufficient because Zelnik could not definitively place him at a particular meeting where Cuti discussed this conspiracy with the principals of the WRG entities, who were in on the scheme. On that basis alone, Tennant reasons that his conviction was based on evidence that was "'at least as consistent with innocence as with guilt,'" and must be reversed. (Tennant Brief at 45 (quoting United States v. Mulheren, 938 F.2d 364, 372 (2d Cir. 1991)). This approach is flawed because not only must the evidence be viewed in the light most favorable to the government, Santos, 449 F.3d at 102, it must also be analyzed "in conjunction [with all of the evidence and] not in isolation," United States v. Persico, 645 F.3d 85, 104 (2d Cir. 2011). This is so because the sufficiency test "must be applied to the totality of the government's case and not to each element, as each fact may gain color from others." Guadagna, 183 F.3d at 130.

We have little difficulty rejecting Tennant's argument that the evidence was insufficient to support the jury's finding that he was aware of the fraudulent character of the transactions at issue. He either knew or had to know that the so-called real estate concession rights that Duane Reade was selling to the WRG entities in 2000 were valueless because he had personally signed or approved transactions that had rendered those very rights worthless in the first place or was otherwise privy to information that revealed their sham character. One conspicuous example of this is the lease remainder in the storefront at 19 Park Place, which Duane Reade sold, pursuant to a document that Tennant personally signed, for $12,500 back to the landlord of that property. The very next day, Tennant personally signed the $806,000 deal with the WRG entities into which the same concessionary right was bundled for $75,000. The jury was entitled to infer guilty knowledge on the part of Tennant, the company's former CFO and senior vice-president who was experienced in real estate matters, from his signing two contracts on back-to-back days to sell the same leasehold interest to two different buyers. Against this and similar evidence, his plea that other company personnel failed to tell him of the fraud could reasonably be rejected by the jury.

Moreover, Zelnik testified at trial that not only was Tennant aware that the concessions being sold were worthless, Tennant and Cuti also determined the arbitrary values that the WRG entities

19

would pay for them, and that it was Tennant who devised the vehicles used to make return payments to the WRG entities. The totality of the government's evidence was more than sufficient for the jury to conclude that Tennant was aware of the fraud that he was helping to perpetrate.

### B. Conscious avoidance charge

Tennant faults the district court for including a conscious avoidance charge in its instructions to the jury, which he says caused him prejudice and warrants reversal of his conviction. The district court instructed the jury that Tennant "knowingly" committed fraud if he was "actually aware he was making or causing a false statement to be made," or if he "(a) was aware of a high probability that, because of the [real estate concession] transactions at issue, Duane Reade's reported financial results were false or misleading but (b) that he deliberately and consciously avoided confirming these facts." (Tr. 5004-05). The Court cautioned, however, that the "knowingly" element would not be satisfied if "Tennant actually believed that the transactions were legitimate and not improper." (Tr. 5005).

Tennant takes no issue with the form of the conscious avoidance instruction, but rather argues that the charge should not have been given at all because there was an insufficient factual predicate to support it. This argument is without merit.

20

We review a claim of error in jury instructions de novo, reversing only where there was prejudicial error in the charge as a whole. United States v. Ebbers, 458 F.3d 110, 124 (2d Cir. 2006). "A conscious-avoidance charge is appropriate when (a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." Id. (quotation marks omitted); see also United States v. Ferguson, 676 F.3d 260, 277-78 (2d Cir. 2011). For example, in a securities fraud case, if a defendant attended meetings that were part of the charged scheme, yet argues that he lacked the requisite scienter because, for example, he "didn't bother to read in full" the documents he signed, the charge is appropriate. Ebbers, 458 F.3d at 124-25.

The Government "need not choose between an 'actual knowledge' and a 'conscious avoidance' theory." Ferguson, 676 F.3d at 278. To the contrary, in many cases, the evidence supporting each theory will be the same:

> [T]he same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct. Moreover, [conscious avoidance] may be established where a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances established the defendant's purposeful contrivance to avoid guilty knowledge.

21

Kozeny, 667 F.3d at 133-34 (quotation marks omitted) (first alteration added).

District courts should pay heed, however, to circumstances in which a conscious avoidance charge may be inappropriate. This is so when the only evidence that alerts the defendant to the high probability of the criminal activity is direct evidence of the illegality such that the question for the jury is whether "the defendant had either actual knowledge or no knowledge at all of the facts in question." United States v. Nektalov, 461 F.3d 309, 316 (2d Cir. 2006)(quotation marks omitted). Similarly, if the defendant denies ever having access to the facts that the government claims should have alerted him to the fraud, the issue is not whether the facts he knew should have alerted him but whether he could even have known those facts. See, e.g., United States v. Adeniji, 31 F.3d 58, 63 (2d Cir. 1994).

In this case, the district court did not err in giving the conscious avoidance charge. The government's theory was that, because Tennant was immersed in sham concession agreements that he personally signed or approved, determined phony values for the contracts, figured out how to get money back to the WRG entities through overpayments and sham consulting services, and met with the principals of the WRG entities to these ends, Tennant had actual knowledge of the fraud.

In response, Tennant argued both that the evidence was lacking that he knew of the fraud and that the facts of which he was aware were insufficient to alert him to a high probability of fraud.[6] This purported lack of knowledge defense, despite Tennant's deep involvement in the transactions that effectuated the fraud, all but invited the conscious avoidance charge. The same evidentiary facts that supported the government's theory of actual knowledge also raised the inference that he was subjectively aware of a high probability of the existence of illegal conduct and thus properly served as the factual predicate for the conscious avoidance charge, Kozeny, 667 F.3d at 133-34. Finally, the government did not have to choose between an "actual knowledge" theory or a "conscious avoidance" theory, Ferguson, 676 F.3d at 278, and the district court did not err in giving both to the jury. Of course, it is plausible that the semi-retired Tennant, attending part-time to complex transactions, might have been sufficiently disengaged or trusting that in fact he lacked knowledge on any culpable level; but the jury was empowered to find otherwise, and did.

---

[6] For example, Tennant's able counsel argued in summation,

> There is no evidence that [Tennant] knew anything about improper sales of leases or lease rights [to the WRG entities]. Then and now he believed them to be entirely proper, arm's-length transactions.

(Tr. 4850).

23

**CONCLUSION**

For the above reasons, and for those set forth in the accompanying summary order, the judgments of conviction and sentence are <u>AFFIRMED</u>.

24