*U.S. v. Cabral*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2019

(Argued:  February 19, 2020      Decided:  November 2, 2020)

No. 19-408

_____

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

PAULO RICARDO DEBARROS CABRAL, AKA VICTOR
SCHMIDT, AKA PAULO BARROS, AKA HANS SCHMIDT,

*Defendant-Appellant.*

_____

Before:      KEARSE, KATZMANN, and BIANCO, *Circuit Judges.*

Defendant-appellant Paulo Ricardo Debarros Cabral appeals from a judgment of conviction entered on February 14, 2019, in the United States District Court for the Southern District of New York (Hellerstein, *J.*), following his conditional guilty plea.  Cabral argues that the 11-year delay between his 2007 indictment and 2018 arrest violated his Sixth Amendment right to a speedy trial.  In particular, Cabral challenges the district court's findings that (1) the delay was attributable to Cabral fleeing to Brazil in 2006 to avoid prosecution, (2) the government exercised reasonable diligence in determining whether Cabral returned to the United States despite its failure to detect his periodic travel into and out of the United States from 2012 until his arrest in 2018, and (3) Cabral has

shown no prejudice from the delay.  We conclude that the district court's findings were not clearly erroneous and, in light of those findings, hold that the delay, though lengthy, did not violate the Sixth Amendment.  Accordingly, we AFFIRM the district court's judgment of conviction.

JACOB R. FIDDELMAN, Assistant United States Attorney (Won S. Shin, *on the brief*), *for* Audrey Strauss, Acting United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

PHILIP L. WEINSTEIN, Of Counsel, Federal Defenders of New York, Inc., New York, NY, *for Defendant-Appellant*.

_____

JOSEPH F. BIANCO, *Circuit Judge*:

Defendant-appellant Paulo Ricardo Debarros Cabral appeals from a judgment of conviction entered on February 14, 2019, in the United States District Court for the Southern District of New York (Hellerstein, *J*.), following his conditional guilty plea.  Cabral argues that the 11-year delay between his 2007 indictment and 2018 arrest violated his Sixth Amendment right to a speedy trial.  In particular, Cabral challenges the district court's findings that (1) the delay was attributable to Cabral's fleeing to Brazil in 2006 to avoid prosecution, (2) the government exercised reasonable diligence in determining whether Cabral returned to the United States despite its failure to detect his periodic travel into

and out of the United States from 2012 until his arrest in 2018, and (3) Cabral has shown no prejudice from the delay. We conclude that the district court's findings were not clearly erroneous and, in light of those findings, hold that the delay, though lengthy, did not violate the Sixth Amendment. Accordingly, we AFFIRM the district court's judgment of conviction.

## I.     BACKGROUND

### A.     Cabral's Criminal Conduct and Departure from the United States

From January to July 2006, Cabral deposited stolen credit card convenience checks into his bank accounts, and immediately withdrew money from the accounts before the checks could be rejected by the banks as fraudulent. According to the government, Cabral obtained these convenience checks from mail that belonged to the prior resident of his apartment in Manhattan, which continued to arrive after Cabral became the new tenant. The total loss to the banks from Cabral's fraudulent conduct was approximately $57,690.

On September 29, 2006, inspectors from the United States Postal Inspection Service ("USPIS") approached Cabral, and he voluntarily agreed to an interview. During this interview, Cabral admitted to depositing stolen checks into his bank accounts. Cabral also gave written consent for USPIS inspectors to search his

3

apartment and signed an admission of guilt. From that search, USPIS inspectors recovered copies of bank statements showing Cabral's deposits of stolen checks, copies of the cancelled checks, a fraudulent Social Security card in Cabral's name, and a fake lawful permanent resident card in Cabral's name.

Several days later, on October 3, 2006, USPIS inspectors attempted to find Cabral at his apartment and determined that it was vacant. Though USPIS inspectors seized Cabral's Brazilian passport at the time of his interview, he was able to obtain new travel documents from the Brazilian consulate in New York and departed the United States a few days after the interview. According to Cabral, the USPIS interview left him "scared," and he "decided to leave early and return to Brazil" because his United States travel permit was expiring soon. App'x at 43.

**B.      Immediate Efforts to Locate Cabral and the Filing of Charges**

After determining that Cabral had vacated his apartment, USPIS inspectors made several attempts to locate him by conducting additional surveillance on his apartment, checking his post office box, and attempting to contact him by phone and email. These immediate attempts were unsuccessful. On October 13, 2006, the government charged Cabral by complaint and entered an arrest warrant for Cabral into the National Crime Information Center ("NCIC") wanted persons

4

database.[1]  Moreover, in early 2007, USPIS inspectors, in a ruse, made additional efforts to locate Cabral by placing several calls to a telephone number associated with him and leaving voicemail messages asking him to return the call because they had money that belonged to him that they wished to return.  Then, in April 2007, USPIS eventually reached Cabral who confirmed that he had returned to Brazil.  Cabral was later indicted on November 16, 2007, on one count of bank fraud in violation of 18 U.S.C. § 1344.

---

[1] The record contains the following uncontroverted explanation of the use and operation of the NCIC system by law enforcement:

> NCIC maintains a series of centralized databases . . . for coordination and information-sharing among this country's many local, state, and federal law enforcement agencies.  One of those databases tracks individuals wanted by various agencies on arrest warrants.  When an arrest warrant is issued, the responsible law enforcement agency can create an entry in the NCIC wanted persons database.  Other law enforcement agencies, upon checking the database for a given individual's name or other identifying information, should then be notified of the existence of the arrest warrant. . . . Because checking the NCIC database in this manner is often a routine component of many interactions between law enforcement and civilians—including, for example, when an individual attempts to enter the country through a Customs and Border Protection port of entry—entering an arrest warrant into the NCIC wanted persons database is generally sufficient to ensure that the law enforcement authority seeking the person in question receives notification if that person is encountered by other law enforcement authorities.

App'x at 159–60.

5

## C.    Subsequent Efforts to Locate Cabral

Over the many years that followed, USPIS inspectors periodically searched various electronic records databases to see if Cabral had returned to the United States. Records indicate that these searches were undertaken in October 2006, February 2007, March 2007, February 2008, August 2008, June 2013, September 2013, and March 2014. Among the databases that were checked at different times over this period were public records databases (such as the LexisNexis Accurint database), credit report databases, and a driver's license database. USPIS personnel also periodically made a number of inquiries of the NCIC system to confirm that the database entry for Cabral remained valid and active, so as to notify other law enforcement agencies of Cabral's status as a wanted individual, and USPIS received such confirmation in January 2008, December 2008, February 2009, December 2010, June 2013, January 2014, and January 2015. In addition, USPIS would periodically check with the United States Attorney's Office to confirm that Cabral's case remained active.

Despite USPIS's multiple confirmations of a valid and active entry in the NCIC database for Cabral, he obtained a visa from the State Department in 2012 and, from 2012–2018, Cabral lawfully traveled to the United States under his real name seven times, with each trip lasting several weeks or months at a time. The

government was unable to ascertain why Cabral was granted a visa by the State Department and allowed repeated entry into the United States by Customs and Border Protection ("CBP") from USPIS records. Given Cabral's active and valid NCIC entry, Cabral should have been flagged as a wanted individual if other agencies like the State Department and CBP checked his name in the NCIC system in connection with his travel into the United States, but apparently no such alert occurred.

The record also indicates that, at some point in or about 2013–2014, USPIS received information that Cabral had been issued a visa by the State Department in 2012. USPIS then contacted Immigration and Customs Enforcement ("ICE") to determine whether Cabral had reentered the United States, but, for reasons unclear from the documentation, ICE incorrectly reported to USPIS in March 2014 that Cabral's last entry to the United States was in 2002. Moreover, in September 2013, USPIS received information about a potential flight by Cabral to San Francisco in October 2012 and a hotel at which he might have stayed. USPIS records show that USPIS inquired with the hotel and was informed that Cabral had not stayed there.

### D. Cabral's Arrest

In 2018, personnel at the Fugitive Locator Unit—a joint task force of several federal agencies—determined that Cabral's name was not properly showing the outstanding arrest warrant when it was run in the NCIC database. At that point, Cabral's name was then manually flagged for arrest by CBP in a separate CBP screening database. That manual entry in the CBP system led to Cabral's arrest on October 11, 2018, at an airport in Houston, on his way back to Brazil from the United States. On October 31, 2018, Cabral was transferred to the Southern District of New York and detained pending trial.

### E. Cabral's Motion to Dismiss

On November 7, 2018, Cabral moved to dismiss the indictment, arguing that the delay between his indictment and arrest violated his Sixth Amendment right to a speedy trial. On November 28, 2018, the district court denied Cabral's motion to dismiss. The district court analyzed the four factors for constitutional speedy trial claims as set forth in *Barker v. Wingo*, 407 U.S. 514 (1972), and made factual findings pursuant to that legal framework. First, the district court noted that the delay between the indictment and arrest was long. Second, the district court determined that the delay was caused by Cabral and that the government

"exhibited a sufficient level of diligence" in attempting to locate Cabral. App'x at 223. Third, the district court found that Cabral timely asserted his speedy trial rights after his arrest, but the district court did not view this factor as important in this particular case. Finally, the district court determined that there was no articulable prejudice to Cabral because no potential witness was now absent and the prosecution was based upon existing records. Thus, after balancing the various factors, the district court concluded that there was no constitutional speedy trial violation and denied the motion.

### F. Cabral's Plea and Sentence

On December 4, 2018, pursuant to a plea agreement with the government under Federal Rule of Criminal Procedure 11(a)(2), Cabral entered a conditional guilty plea to one count of bank fraud. The plea agreement expressly preserved Cabral's right to appeal the denial of his motion to dismiss on speedy trial grounds.

On February 12, 2019, Cabral was sentenced to time served, and was ordered to forfeit $57,690 and to pay the $100 mandatory special assessment. Following sentencing, Cabral was also ordered to pay $26,315.98 in restitution. By

9

consent of both parties, Cabral was removed from the United States to his native country of Brazil.

This timely appeal followed.

## II.    DISCUSSION

### A.    Standard of Review

We review a district court's determination as to whether there has been a Sixth Amendment violation of the speedy trial right for abuse of discretion.  *United States v. Moreno*, 789 F.3d 72, 78 (2d Cir. 2015).  A district court abuses its discretion when "its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or if its decision cannot be located within the range of permissible decisions."  *United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013).  A district court's improper weighing of the *Barker* factors can qualify as such an error of law.  *Moreno*, 789 F.3d at 78 ("[I]f we conclude that the district court struck the incorrect balance, we must reverse.").

### B.    Constitutional Right to a Speedy Trial

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI. The right to a speedy trial protects the accused's interest in "decent and fair

procedures" and the public's interest in an efficient judicial system. *Barker*, 407 U.S. at 519. This constitutional right is "triggered by arrest, indictment, or other official accusation." *Doggett v. United States*, 505 U.S. 647, 655 (1992). With respect to the defendant's interests, the speedy trial right is designed "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. Only the third form of prejudice is potentially implicated here: whether the delay between Cabral's indictment and arrest caused a Sixth Amendment violation by impairing his defense.

In evaluating whether there has been a constitutional speedy trial violation, the Supreme Court has identified four factors that district courts must balance. These factors are the "length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Moreno*, 789 F.3d at 78 (quoting *Barker*, 407 U.S. at 530) (brackets omitted). The first factor—the length of delay—is a threshold inquiry. *Id.* In other words, "[a] long delay between indictment and trial is presumptively prejudicial to the defendant and triggers an inquiry into the other three *Barker* factors." *United States v. Blanco*, 861 F.2d 773, 777 (2d Cir. 1988). A defendant must show that the time period at issue has crossed

the threshold "dividing ordinary from 'presumptively prejudicial' delay." *United States v. Ghailani*, 733 F.3d 29, 43 (2d. Cir. 2013) (quotation marks omitted). We have emphasized that "the notion of a delay that is 'presumptively prejudicial' (*i.e.* long enough to trigger a Sixth Amendment inquiry) should not be confused with a delay that is so long as to cause 'presumptive prejudice' (*i.e.* prejudice that need not be specifically shown)" under the fourth *Barker* factor. *Moreno*, 789 F.3d at 78 n.3. "The former bears upon the need for a *Barker* analysis, whereas the latter bears upon the merits of that analysis." *Id.* Once the delay is determined to be sufficient to trigger the *Barker* inquiry, the length of delay is then considered "as one factor among several" in conducting the requisite balancing. *Doggett*, 505 U.S. at 652.

Under a *Barker* analysis, no one factor is necessary or sufficient to find a deprivation of the right to a speedy trial. *Moreno*, 789 F.3d at 78. Thus, delay, no matter how lengthy, "cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria." *Doggett*, 505 U.S. at 656. Instead, all four factors "must be considered together with such other circumstances as may be relevant." *Moreno*, 789 F.3d at 78 (internal quotation marks omitted).

12

### C. Analysis of the *Barker* Factors

Cabral argues that his Sixth Amendment right to a speedy trial was violated because of the delay between his 2007 indictment and 2018 arrest.[2] Here, there is no doubt that the 11-year pre-arrest delay was more than sufficient to trigger the *Barker* inquiry, which then required the district court to analyze that delay in the context of the other factors. *See Doggett*, 505 U.S. at 652 ("[T]he extraordinary 8½ year lag between [the defendant's] indictment and arrest clearly suffices to trigger the speedy trial enquiry . . . ."); *see also Moreno*, 789 F.3d at 82 n.10 (delay of 27 months sufficient to trigger *Barker* analysis). Moreover, as it relates to the third factor, it is uncontroverted that Cabral asserted his right to a speedy trial in a timely fashion once he was arrested, which the district court recognized as well. Although the district court concluded that his timely assertion of the right after arrest was not "much of a factor," App'x at 221, Cabral does not specifically challenge the district court's failure to accord significant weight to that factor.[3] Instead, Cabral principally argues that the district court erred in finding that the

---

[2] Cabral does not also claim a violation of statutory rights under the Speedy Trial Act once he was arrested. Thus, our analysis is confined to a constitutional claim under the Sixth Amendment.

[3] In any event, we see no error in that factual finding or the assessment of its weight by the district court in this case.

government bore no fault for any of the 11-year delay and in finding a lack of prejudice to Cabral from the delay, and further contends that those erroneous findings led to an incorrect balancing of the *Barker* factors. Thus, we turn to those two remaining *Barker* factors and conclude, for the reasons discussed below, that the district court's findings were not clearly erroneous. Accordingly, in light of those findings and the corresponding balancing of the *Barker* factors, we agree with the district court that Cabral's Sixth Amendment right to a speedy trial was not violated.

### 1. The Reasons for the Delay

The second factor—the reason for the delay—is "often critical." *Moreno*, 789 F.3d at 79. Delay caused by deliberate government misconduct for tactical reasons weighs strongly in favor of finding a speedy trial violation, while government negligence "should be weighted less heavily." *Barker*, 407 U.S. at 531. In this context, the Sixth Amendment is "rarely violated" if the delay is "attributable entirely to the defendant," *Moreno*, 789 F.3d at 79 (citing *Vermont v. Brillon*, 556 U.S. 81, 90 (2009)), or if the delay "serves some legitimate government purpose" such as time to collect witnesses, oppose pretrial motions, or to track down a defendant if he goes into hiding, *id.* (citing *Doggett*, 505 U.S. at 656). In particular, "a court

14

need not ignore a defendant's fugitivity in considering whether there has been a violation of his sixth amendment right to a speedy trial." *Rayborn v. Scully*, 858 F.2d 84, 90 (2d Cir. 1988). However, even if a defendant flees to avoid capture or prosecution, the government can be at fault for the delay if it failed to use "'reasonable diligence'" to locate him and thereby lengthened the delay. *Moreno*, 789 F.3d at 79 (quoting *Doggett*, 505 U.S. at 656–57). We emphasize the importance of recognizing that the circumstances surrounding the delay may change over time and that, in such situations, a district court must separately assess the reasons for the delay during each of these differing periods, including potential determination of which party is responsible for the delay in a particular disputed period. *See, e.g., id.* at 80 (noting that "if the government acted with diligence during some period of the delay, only periods of the delay attributable to negligence should be weighed against the government").

The district court found that "[t]he reason for the delay is a simple one, defendant left the country." App'x at 220. It further explained: "It seems clear that defendant left the country because he had the ability to leave the country and he knew from the interview with the U.S. Postal Inspector and from the evidence

15

that was found in his apartment, that he could not successfully defend against the inevitable prosecution."  App'x at 220.

With respect to the period from the indictment in 2007 until September 2012, there is overwhelming, uncontroverted evidence to support the district court's finding that Cabral fled to Brazil in October 2006 to avoid his "inevitable prosecution" and was wholly at fault for the delay.  Cabral abruptly left the United States for Brazil within days of his incriminating interview with USPIS, which led to the recovery of evidence during a search of his apartment, and he did not return to the United States for approximately six years.  Moreover, Cabral concedes that his extradition to the United States was not feasible (as the district court found) because Cabral was a Brazilian citizen and "the Brazilian Constitution forbids extradition of its citizens."  Appellant's Br. at 6 n.3.  Thus, USPIS was not required to pursue a futile extradition request, but rather exercised reasonable diligence in entering his name in the NCIC system immediately upon obtaining the criminal complaint and arrest warrant for Cabral in October 2006.  After learning of his presence in Brazil, USPIS continued to confirm that the NCIC entry was active and valid and made other efforts to determine if he had returned to the United States. *See, e.g.*, *United States v. Diacolios*, 837 F.2d 79, 83 (2d Cir. 1988) ("[W]e are aware of

16

no case that holds that a formal request for extradition must be made before due diligence can be found to have existed. Due diligence surely does not require the government to pursue that which is futile." (citation omitted)).

In addition, the fact that Cabral had not been formally charged when he fled does not undermine the district court's well-supported finding that Cabral was at fault by intentionally leaving the United States because he knew that he had no defense to his inevitable prosecution after the USPIS interview and search. *Cf. Strachan v. Colon*, 941 F.2d 128, 130 (2d Cir. 1991) (noting, in the context of the Extradition Clause, that "[t]here is no requirement that the accused must leave *after* charges have been filed in order to be considered a fugitive under the Constitution"). The critical fact for purposes of assessing fault to a defendant in this context is not the existence of formal charges, but rather his evasive actions to avoid ever facing such charges—whether formally filed or impending. *See, e.g., United States v. Villarreal*, 613 F.3d 1344, 1351 (11th Cir. 2010) ("A government's inability to arrest or try a defendant because of the defendant's own evasive tactics constitutes a valid reason for delay."). To hold otherwise would allow a defendant, who is aware of a government investigation and imminent charges, to escape fault under the speedy trial analysis by quickly fleeing before the formal

prosecution is commenced. In fact, even Cabral concedes for purposes of this appeal "that the approximately 7 months between September 2006 when Cabral returned to Brazil after being interviewed by law enforcement and his telephone discussions with [a USPIS inspector] in April 2007[] should be counted against him." Appellant's Br. at 13.

Furthermore, although Cabral faults the government for not advising him in April 2007, when it was able to telephonically communicate with him while he remained in Brazil, that he had been charged in a criminal complaint, that omission by the government does not transfer the fault for the delay away from Cabral. It was certainly reasonable for the government to infer, from Cabral's immediate flight following the interview and search, that this Brazilian citizen was not likely to return to the United States to invoke his speedy trial right if told that he had been formally charged with a federal crime. Thus, in light of his initial flight to Brazil, the government should not be faulted for attempting to lure Cabral back to the United States by hiding the existence of the arrest warrant or the complaint by telling him that it had money that it wanted to return to him.[4] In short, Cabral has no one to blame for the initial 5-year delay other than himself.

---

[4] Cabral also contends in his brief that "once he spoke to the federal agent in 2007, Cabral no longer had a reason to believe criminal charges might be pending at that time" and

We must, however, separately assess whether the government was at fault for the delay once Cabral returned to the United States under his real name in 2012, and then traveled back and forth to the United States six additional times between September 2012 and his arrest in October 2018. For this period, although Cabral concedes that USPIS had timely entered his name into the NCIC system and that no alert was generated during his travels to the United States due to some type of system malfunction, Cabral argues that "the government did not attempt to ascertain the reason that the arrest warrant was 'not popping up' until late 2018" and "[i]ts failure to do so constitutes official negligence and is attributable solely to the government." Appellant's Br. at 15. On this issue, the district court found that the government "exhibited a sufficient level of diligence." App'x at 223. The

---

"[h]e remained in Brazil because he was a citizen of that country, not because he sought to avoid arrest." Appellant's Br. at 14. The district court, however, was not required to credit that assertion regarding his state of mind in light of, among other things, his incriminating statements to law enforcement, the additional incriminating documents found during the search, his abrupt departure to Brazil within days of the search and interview, and the lack of any evidence in the record (or claim from Cabral) that the USPIS inspector represented to him in that 2007 conversation that he had not been (or would not be) charged with a crime. In fact, in his declaration filed in the district court in support of his speedy trial motion, although Cabral stated that he has worked in the travel industry since 2001 and frequently traveled to the United States for weeks or months at a time in connection with the business until his arrest (including numerous trips to the United States between 2012 and 2018), he provides no explanation as to why he did not travel to the United States on such business for almost six years (from 2006 to 2012) if he was not concerned that he would be located and arrested.

19

district court elaborated by finding that malfunctions happen with databases, and "this unexplained ability to pick up the defendant when he visited the United States on several occasions from 2012 on is not sufficient to overcome the second criteria of *Barker*, the fact that the defendant was responsible for the delay by absenting himself from the United States." App'x at 223. Based upon our review of the record, we cannot conclude that this finding was clearly erroneous.

First, between 2008 and 2015, USPIS personnel made periodic inquiries of the NCIC system to confirm that the database entry for Cabral remained valid and active to notify other law enforcement agencies of Cabral's status as a wanted individual, and received such confirmation in January 2008, December 2008, February 2009, December 2010, June 2013, January 2014, and January 2015. Second, upon confirming in April 2007 that Cabral had returned to Brazil, USPIS inspectors continued to periodically run searches on various databases (including public records databases, a driver's license database, and credit report databases) to determine if Cabral had returned to the United States, including searches undertaken in February 2008, August 2008, June 2013, September 2013, and March 2014. Third, although Cabral notes that USPIS received information in the 2013–2014 timeframe that Cabral had received a visa from the State Department in 2012,

20

USPIS did not ignore that information, but rather contacted ICE to determine whether Cabral had reentered the United States. For reasons unclear from the documentation, ICE incorrectly reported to USPIS in March 2014 that Cabral's last entry to the United States was in 2002. Nor did USPIS ignore information it received about a flight Cabral may have made to San Francisco in October 2012 and a hotel at which he might have stayed; rather it took additional investigative steps to locate Cabral in September 2013. Upon further investigation of the information, including an inquiry of that hotel, USPIS was informed that Cabral had not stayed there.

To be sure, the law enforcement efforts taken to locate Cabral between 2012–2018 were far from exhaustive. However, that is not the legal test. We have emphasized that "law enforcement officials are not expected to make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension or who has fled to parts unknown." *Rayborn*, 858 F.2d at 90; *see also Moreno*, 789 F.3d at 79 ("An investigation is not unreasonable simply because it misfires or fails of its purpose, or because other measures would have been more fruitful."). Instead, in order to avoid having the delay attributed to the government in this context, "'reasonable diligence'" by law enforcement in locating the defendant is all that is

required.  *Moreno*, 789 F.3d at 79 (quoting *Doggett*, 505 U.S. at 656–57).  We have further explained that district courts, in assessing the degree of diligence, should not judge law enforcement's actions with the benefit of hindsight, but rather consider the mix of information available at the time and grant "the day-to-day tactical decisions of law enforcement a measure of deference."  *Id.*  In short, "[s]o long as the government made serious investigative efforts calculated to achieve arrest, it acted reasonably for Sixth Amendment purposes."  *Id.* at 79–80; *see also Doggett*, 505 U.S. at 652 (upholding a finding of government negligence where there was a failure to make any "serious effort" to locate the defendant).

Thus, if a defendant's whereabouts were unknown, this Court and other courts have repeatedly held that reliance on the NCIC wanted persons database (or other similar law enforcement databases), in combination with basic investigative efforts such as checking public records databases and following any leads, satisfies the diligence required for purposes of the Sixth Amendment speedy trial analysis.  *See, e.g., Blanco*, 861 F.2d at 778 (affirming district court's finding of diligence by the government because the government entered the defendant's information into NCIC system, spoke to an informant, and searched hospitals for a patient matching the defendant's description and condition); *Moreno*, 789 F.3d at

80 (holding that entering the defendant's name into the NCIC database, pursuing leads, and requesting utility bills and travel records were "diligent and reasonably calculated to lead to capture"); *accord United States v. Wanigasinghe*, 545 F.3d 595, 598 (7th Cir. 2008); *United States v. Corona-Verbera*, 509 F.3d 1105, 1115 (9th Cir. 2007); *United States v. Walker*, 92 F.3d 714, 718 (8th Cir. 1996); *United States v. Aguirre*, 994 F.2d 1454, 1455–57 (9th Cir. 1993); *United States v. Deleon*, 710 F.2d 1218, 1221–22 (7th Cir. 1983).[5]

In the instant case, given (1) the entering of Cabral's name into the NCIC database, (2) the periodic checks to confirm that the NCIC entry was active and

---

[5] The cases cited by Cabral in which government negligence was found are not to the contrary because they involved circumstances where law enforcement failed to enter the arrest in the NCIC database and/or failed to engage in any serious investigative efforts to locate the defendant. For example, in *United States v. Boone*, the district court found that the arrest warrant was not entered into the NCIC database, the government's evidence failed "to establish that [the defendant] took any specific steps with the intent of evading arrest," and the government "produced no evidence indicating that it put forth 'serious effort' to find and arrest [the defendant]." 706 F. Supp. 2d 71, 76 (D.D.C. 2010) (quoting *Barker*, 407 U.S. at 531). Similarly, in *United States v. Mendoza*, the Ninth Circuit held that there was insufficient evidence "to support a finding that the government conducted a serious effort to find [the defendant]" where "the record [was] silent as to any efforts by the government to apprehend [the defendant] beyond merely entering [the defendant's] arrest warrant in the law enforcement database." 530 F.3d 758, 764 (9th Cir. 2008). Finally, in *United States v. Erenas-Luna*, the Eighth Circuit upheld a finding of government negligence where law enforcement officers did not enter the defendant's arrest warrant into the NCIC database for well over two years and "made no efforts to locate and arrest [the defendant] over a three-year period," despite knowledge of his contacts in various places and a tip from an informant that he was in Nebraska. 560 F.3d 772, 775, 777 (8th Cir. 2009).

valid, (3) the independent periodic searches of other databases (including public records databases) to determine if Cabral had returned to the United States, and (4) the additional investigative steps taken when receiving information that Cabral may have returned to the United States starting in 2012, there is sufficient evidence to support the district court's finding that USPIS made serious investigative efforts to locate Cabral during the entire period of delay, including the period from 2012 until his arrest in 2018 when he was traveling back and forth to the United States without triggering NCIC notifications due to some apparent malfunction in the system.

This case is analogous to the circumstances in *United States v. Machado*, 886 F.3d 1070 (11th Cir. 2018), in which the Eleventh Circuit affirmed the district court's finding that there was no negligence by the government where an agent placed the defendant's name in the NCIC system but, due to some technological issue, the agent was not alerted when the defendant reentered the United States in 2010 and 2014, and the agent's database searches did not uncover the defendant's activities in the United States. In concluding that the technical issues with the database did not warrant a finding that the government should be faulted for the delay, the Eleventh Circuit explained:

[The law enforcement agent] was not aware of Machado's presence in the United States until the arrest in 2016, and [the agent's] database searches did not uncover Machado's updated license, credit card, or bank account. These failures speak more to technological gaps than to [the agent's] negligence. [The agent's] efforts included planned interception of Machado at the border via the NCIC system and periodic searches for indicia of Machado's continued presence in the United States. These efforts were carried out in good faith and with due diligence, and were all that was required of [the agent]. The district court's factual findings in this regard were not clearly erroneous.

*Id.* at 1081.

We conclude, as the Eleventh Circuit did in *Machado*, that the government should not be found to be negligent based solely on an apparent malfunction, technological or otherwise, with the NCIC system, especially where USPIS checked on multiple occasions over the period of delay to ensure that the entry was active and valid. Similarly, although USPIS learned that Cabral had obtained a visa in 2012, USPIS should not be deemed negligent because it inquired as to Cabral's use of that visa and was misinformed by ICE that Cabral had last entered the United States in 2002.[6] There is no claim by Cabral that USPIS was acting in

---

[6] We note that the NCIC database is consulted as part of the visa issuance process, *see* 22 C.F.R. § 40.5(b), and so the very fact that Cabral was granted a visa might have alerted USPIS to the possibility that Cabral's NCIC entry was not functioning properly. We cannot conclude that this oversight demands a finding of negligence, however, given USPIS's repeated and apparently good-faith efforts to confirm that the warrant entry was active and valid.

bad faith in relying on that representation by ICE, and USPIS even made other independent efforts, upon receiving that information from ICE in March 2014, to confirm that Cabral was not in the United States, including a search of the LexisNexis Accurint database and a search of another unidentified public records database. We recognize that there are circumstances where these types of errors, whether by the investigating agents or others within the government bureaucracy at large, can individually or cumulatively be a strong indicator of a lack of reasonable diligence under the Sixth Amendment by the government, but such a finding is not compelled by the record in this particular case.[7] In short, given the investigative efforts by USPIS over the entire period (including the period in which

---

[7] For example, if there were evidence of knowledge of persistent and widespread errors in the functioning of the NCIC system, the government could be found to be negligent in not addressing the cause of such errors over time, or in not developing additional protocols to operate as a check on the NCIC system. Here, no such evidence is contained in the record. Moreover, if it would have been apparent to any reasonable law enforcement agent that the information provided by ICE could not have been accurate in light of other information known to that agent about Cabral and his travels, then a negligence finding may be warranted if the agent failed to take additional steps to resolve the contradictory information. Here, the information provided by ICE in March 2014 that indicated that Cabral had last entered the United States in 2002 was not on its face inconsistent with Cabral having been present in the United States until 2006. In addition, the act of obtaining a visa does not necessarily indicate *actual* travel to the United States because a person's intended plans may change. In any event, as noted above, USPIS also conducted another independent check of public records databases in March 2014 for any indication of Cabral's presence in the United States, and that check was negative, and additionally confirmed in January 2015 that the warrant was still active and valid in NCIC.

Cabral was frequently traveling into the United States), the district court's finding of sufficient diligence by the government, which is entitled to "considerable deference," *Doggett*, 505 U.S. at 652, was not clearly erroneous. Accordingly, in light of that finding, the district court properly concluded that this second factor, which is "often critical," *Moreno*, 789 F.3d at 79, weighed against the defendant.

### 2.    The Issue of Prejudice

The other contested *Barker* factor relates to the issue of prejudice. As to that factor, the Supreme Court in *Doggett* observed that "we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." 505 U.S. at 655. At the same time, however, the Court emphasized that "such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria," but rather "it is part of the mix of relevant facts, and its importance increases with the length of delay." *Id.* at 656. More specifically, the Court made clear that, if the government pursues a defendant with reasonable diligence, the Sixth Amendment claim fails "however great the delay" unless the defendant can show "specific prejudice to his defense." *Id.*; *see also United States v. Hills*, 618 F.3d 619, 632 (7th Cir. 2010) ("[A]s long as the government shows reasonable diligence

27

in prosecuting its case, a defendant who cannot demonstrate prejudice with specificity will not show a Sixth Amendment violation, no matter how long the delay."); *United States v. Corona-Verbera*, 509 F.3d 1105, 1116 (9th Cir. 2007) (same); *United States v. Brown*, 325 F.3d 1032, 1035 (8th Cir. 2003) (same).

In the instant case, because the district court found that the government acted with reasonable diligence, Cabral cannot rely on any presumption of prejudice; instead, under *Doggett*, he must show actual prejudice. The district court found that there was no "articulable ground for a finding of prejudice," explaining that "[n]o witness has been identified whose absence will be important" and "[t]he records are the records, and it looks to [the district court that] the case is a compelling one from the records." App'x at 221. As set forth below, we can discern no clear error in that finding. The record reflects that the government's proof that Cabral deposited stolen credit card convenience checks into his bank account without authorization was overwhelmingly document-based—including the intended use of documents from Cabral's bank accounts, relevant bank documents and false identification documents recovered during the search of his apartment, surveillance video from one of the banks where Cabral deposited some of the stolen checks, and a signed written statement from Cabral.

Furthermore, given the nature of the proof, any potential defense also would have undoubtedly been document-based and thus unimpaired by the delay.

Cabral contends that, notwithstanding this documentary evidence and his admissions in the USPIS interview that he deposited the stolen checks into checking accounts that did belong to him, he is prejudiced by the delay because he also noted in the interview (and his written statement) that he did not know it was illegal to do so because the practices in Brazil for depositing checks are different than in the United States. Thus, Cabral suggests that the government would have had to independently prove that level of criminal intent at trial from evidence beyond his admissions and the documents. We find this argument to be unpersuasive. As a threshold matter, although the government needs to prove as an element of the mail fraud statute that Cabral had the intent to defraud by depositing the stolen checks into his bank account without authorization, it need not also establish that he knew that it was against the law to do so. *See United States v. Porcelli*, 865 F.2d 1352, 1358 (2d Cir. 1989) ("The specific intent required under the mail fraud statute is the intent to defraud, and not the intent to violate a statute." (citation omitted)). Moreover, here, there is no suggestion that the government's proof regarding Cabral's specific intent to defraud, along with the

29

other essential elements, would have been based upon anything other than a documentary record.

Cabral also contends that he suffered actual prejudice because he could not locate an alleged co-conspirator that he referred to in his written statement as the person who gave him the stolen checks, and this person is a "missing and crucial witness." Appellant's Br. at 20. But this argument is equally unavailing. Cabral has not established that this witness was unavailable following his arrest. Cabral merely asserts that he "did not know where that person currently resided," Appellant's Br. at 20, but provides no details about any efforts that were made to attempt to find him after Cabral's arrest.

In any event, Cabral failed to provide the district court with any basis to conclude that this individual would have waived his Fifth Amendment privilege and somehow exculpate Cabral in his purported testimony. *See Thomas v. United States*, 501 F.2d 1169, 1172 (8th Cir. 1974) ("A missing witness whose testimony cannot help a defendant constitutes a flimsy basis on which to claim prejudice."). Cabral specifically suggests that this individual could have shed light on the reference in Cabral's written confession to "money orders" in his Washington Mutual Bank account that Cabral received in the mail from Spain. Appellant's Br.

at 20. However, the materiality of that vague reference to "money orders" in the written confession is far from clear, especially in light of Cabral's admitted additional use of his Commerce Bank account to accomplish the fraud, as well as his separate admission in his written statement that the stolen "checks" he deposited were received from this individual in Cabral's apartment (not in the mail from Spain). App'x at 17. Furthermore, in his declaration to the district court in support of his speedy trial motion, Cabral does not even mention any issue regarding "money orders" or articulate in any way why this individual would have had exculpatory information that would be helpful to Cabral; rather, Cabral states, in one conclusory sentence, "[T]here was a man involved in what happened, but I have not seen him since 2006 and have no idea where he might be." App'x at 44. To satisfy his burden of demonstrating actual prejudice, Cabral was required to explain to the district court why this individual's testimony, including with respect to any money orders from Spain or any other issue, would have been relevant to some defense on the charge in the indictment. Cabral failed to do so. Given the lack of evidence regarding his unavailability if Cabral had gone to trial and the speculative nature of Cabral's assertion that he would have

testified favorably for Cabral, this "missing" witness does not support a finding of actual prejudice to Cabral from the delay.

Finally, to the extent that Cabral also alleges without specificity that he "ha[s] trouble remembering everything about what happened" in 2006, App'x at 44, such a generalized claim of memory problems is not sufficient for a defendant to show the required "specific prejudice to his defense," *see Doggett*, 505 U.S. at 656; *see also United States v. Manning*, 56 F.3d 1188, 1194 (9th Cir. 1995) ("Generalized assertions of the loss of memory, witnesses, or evidence are insufficient to establish actual prejudice."); *United States v. Koller*, 956 F.2d 1408, 1414 (7th Cir. 1992) ("[The defendant's] general allegation that his witnesses' memories faded during the delay does not rise to the level of specificity required to show actual prejudice.").

Accordingly, the district court did not err in finding that the fourth *Barker* factor weighed against Cabral.

*      *      *

In sum, the district court's findings—including that Cabral was at fault for the 11-year delay, that the government exercised reasonable diligence in attempting to locate him, and that Cabral identified no prejudice from the delay—

were not clearly erroneous based upon the record. In light of those findings, the district court properly balanced the *Barker* factors in concluding that the delay, though lengthy, did not violate Cabral's Sixth Amendment right to a speedy trial.

### III.   CONCLUSION

For the reasons above, we **AFFIRM** the district court's judgment of conviction.