UNITED STATES of America, Appellee,

v.

Louis SALERNO, Defendant,

Gaetano DiGirolamo, Sr.,
Defendant–Appellant.

No. 1574, Docket 94–1640.

United States Court of Appeals,
Second Circuit.

Argued May 26, 1995.

Decided Sept. 26, 1995.

Lawrence F. Ruggiero, New York City, for appellant.

Douglas T. Burns, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty., and Julie E. Katzman, Asst. U.S. Atty., on the brief), for appellee.

Before: KEARSE, CALABRESI and CABRANES, Circuit Judges.

CALABRESI, Circuit Judge:

In March of 1991, appellant Gaetano DiGirolamo, Sr., and his co-defendant, Louis Salerno, were arrested in a government sting operation targeting heroin distribution in Long Island, New York. After a jury trial, both DiGirolamo and Salerno were convicted of conspiracy to distribute heroin and conspiracy to possess more than one kilogram of heroin with intent to distribute, in violation of 21 U.S.C. § 846, and of possession, with intent to distribute, of more than one kilogram of heroin, in violation of 21 U.S.C. § 841(a)(1). On November 4, 1994, the district court (Johnson, *J.*) sentenced DiGirolamo to life imprisonment. DiGirolamo appeals his conviction and his sentence. We affirm both.

## I. BACKGROUND

The government's evidence showed that in March of 1991, as part of a government effort to uncover Long Island distributors of heroin that originated in Pakistan, DiGirolamo was identified as a possible heroin dealer. The government obtained DiGirolamo's phone number from a source in Pakistan. At the government's request, a confidential informant ("the CI") contacted DiGirolamo on March 7, 1991. The CI told DiGirolamo that he had obtained DiGirolamo's number from Hizbullah Khan, a friend of DiGirolamo's in Pakistan. The CI and DiGirolamo then had a series of meetings and conversations in which they discussed importing 12 kilograms of heroin. During an early phone conversation, on March 19, DiGirolamo expressed reservations about dealing with the CI, but whatever qualms DiGirolamo may have had disappeared once DiGirolamo spoke to Khan by telephone.

After a number of other phone calls and encounters, DiGirolamo arranged for the CI to meet a buyer, defendant Louis Salerno. Subsequently, the CI and Salerno completed a transaction for 12 kilograms of heroin. Salerno and DiGirolamo were then arrested.

DiGirolamo claimed in defense that he was entrapped. He did not testify himself, but presented evidence that a friend who was an attorney had represented Khan and had posted a $25,000 bond for Khan in Khan's immigration proceedings. Khan had then fled the United States, causing the bond to be forfeited. DiGirolamo argued that his involvement with the CI was solely an effort to help the attorney find Khan in order to regain the $25,000 that had been forfeited, and that DiGirolamo had not been predisposed to commit a crime.

The jury found both DiGirolamo and Salerno guilty on January 27, 1993. In November 1994, DiGirolamo came before the district court for sentencing. The district court concluded that a life sentence was required by 21 U.S.C. § 841(b)(1)(A) (1988 & Supp.1991), as it read at the time of DiGirolamo's offense, because DiGirolamo had two prior convictions for felony drug offenses.[1] In the alter-

---

**1.** Section 841(b)(1)(A) was amended in 1994. *See* 21 U.S.C.A. § 841(b)(1)(A) (West 1995)

native, the district court calculated a sentence for DiGirolamo under the Sentencing Guidelines. The district court determined that DiGirolamo was a career offender under the Guidelines because he had two or more prior convictions for crimes of violence or controlled substance offenses. *See* U.S.S.G. § 4B1.1. The resulting criminal history category, combined with DiGirolamo's offense level, called for a sentence of 360 months to life. The district court decided that, even in the absence of the required sentence of life imprisonment under 21 U.S.C. § 841(b)(1)(A) (1988), life imprisonment was appropriate. DiGirolamo, who is serving his sentence, appeals both the sentence and the underlying conviction.

## II. DISCUSSION

Only two aspects of DiGirolamo's appeal require discussion. As to his conviction, DiGirolamo claims that the jury's rejection of his entrapment defense was based on erroneous instructions and erroneous factual findings. As to his sentence, he argues that the district court erred in treating his prior conviction under the Travel Act, 18 U.S.C. § 1952 (1986) (as it read at the time applicable to DiGirolamo),[2] as a "felony drug offense" which, in combination with another prior felony drug offense, mandated the imposition of a sentence of life imprisonment. We address these contentions in turn.

### 1. *The Entrapment Defense*

■■■ DiGirolamo first claims that he was entrapped as a matter of law. Entrapment has two elements: (1) government inducement of the crime, and (2) lack of predisposition on the defendant's part. *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). When a defendant presents credible evidence of inducement by a government agent, the government is required to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. *Jacobson v. United States,* 503 U.S. 540, 549, 112 S.Ct. 1535, 1540–41,

118 L.Ed.2d 174 (1992). On appeal, the government concedes that there was evidence of inducement. The question therefore is whether the government met its burden of proving beyond a reasonable doubt that DiGirolamo was predisposed to commit the crime. DiGirolamo's argument—that he was entrapped as a matter of law—is in substance an attack on the sufficiency of the government's evidence of predisposition. *See United States v. Harvey,* 991 F.2d 981, 992 (2d Cir.1993). Hence, that evidence must be viewed in the light most favorable to the government, and all reasonable inferences must be drawn in the government's favor. *E.g., United States v. Aulicino,* 44 F.3d 1102, 1114 (2d Cir.1995).

■■■ A defendant is predisposed to commit a crime if he is " 'ready and willing without persuasion' to commit the crime charged and 'awaiting any propitious opportunity' " to do so. *Harvey,* 991 F.2d at 992 (quoting *United States v. Williams,* 705 F.2d 603, 613 (2d Cir.), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983)). Predisposition may be shown by evidence of:

> "(1) an existing course of criminal conduct similar to the crime for which [the defendant] is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement."

*United States v. Valencia,* 645 F.2d 1158, 1167 (2d Cir.1980) (quoting *United States v. Viviano,* 437 F.2d 295, 299 (2d Cir.), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971)), *amended,* 669 F.2d 37 (2d Cir.1981).

■■■ The government introduced evidence that DiGirolamo readily agreed to the transaction. The government also introduced evidence that DiGirolamo was able to put together a deal involving 12 kilograms of heroin with little difficulty. Such evidence of

---

(available on Westlaw). The extent to which that amendment might affect future cases similar to DiGirolamo's is discussed briefly at note 4, *infra.*

2. The Travel Act received technical amendments in 1990 and more substantive amendments in 1994. *See* 18 U.S.C.A. § 1952 (West 1995) (available on Westlaw).

capacity to organize a crime speedily supports an inference that DiGirolamo had an already-formed design and an existing course of criminal conduct. *Cf. Valencia,* 645 F.2d at 1167 (evidence that the defendants had a ready source for cocaine and were able to obtain a large amount of cocaine on credit on short notice supported an inference that they had an already-formed design and existing course of criminal conduct).

DiGirolamo, in contrast, emphasizes his reluctance to be involved in the deal. He points in particular to a phone call that he had with the CI on March 19, 1991, in which he told the CI that "there's no way there's anything can be done." There was evidence, however, that DiGirolamo displayed no such hesitation in his initial discussions with the CI, when the CI first proposed the deal. Moreover, whatever reluctance DiGirolamo displayed quickly evaporated after DiGirolamo was able to contact Khan, his friend in Pakistan. The jury therefore could reasonably view DiGirolamo's hesitance not as reluctance to engage in criminal activity, but rather as a transient manifestation of unease about dealing with someone he did not know. Viewing the evidence as a whole and in the light most favorable to the government, we conclude that there was sufficient evidence to support a jury finding that DiGirolamo was readily willing and predisposed to commit the crime proposed by the CI.

DiGirolamo also contends that the district court erred by failing to include certain requested language, discussed below, in its entrapment instruction to the jury. In particular, DiGirolamo challenges the district court's charge as to "government inducement." While the government conceded the existence of evidence of inducement on appeal, it did not do so at trial. Because we cannot be sure whether the jury's rejection of DiGirolamo's entrapment defense rested on a finding that DiGirolamo was predisposed or on a finding that there was no evidence that DiGirolamo was induced, we must consider the adequacy of the district court's inducement charge.[3]

The judge instructed the jury as follows: The defendant DiGirolamo asserts a defense that he was the victim of entrapment by an agent of the government. While the law permits government agents to trap an unwary criminally minded person, the law does not permit the government agents to entrap an unwary innocent. Thus a defendant may not be convicted of a crime if it was the government who also persuaded him to commit the crime, and if he was not ready and willing to commit the crime before the government officials or agents spoke with him.... On the other hand, if the defendant was ready and willing to violate the law and the government merely presented him with an opportunity to do so, that would not constitute entrapment. Your inquiry on this issue should first be to determine if there is any evidence that a government agent took the first step that led to a criminal act. If you find there was no such evidence, there can be no entrapment and your inquiry on this defense should end.

DiGirolamo effectively concedes that this instruction accurately states the law of this circuit for cases in which direct inducement by a single government agent is involved. He contends, however, that his case differs from the norm because of the involvement of several different government operatives, and that in the absence of a more specific charge the jury was not in a position to decide whether improper inducement could be ascribed to one or another of them. First, noting that there was no evidence that the CI was formally employed by the government, and that the jury therefore may have been confused about the CI's status, DiGirolamo states that the district court should have instructed the jury that, "as a matter of law," the CI "was an agent of the government," and that therefore any inducement on his part was inducement by the government. Second, DiGirolamo claims that the district court erred in referring in its charge to a

---

**3.** We note that DiGirolamo did not request a charge that, as a matter of law, there was evidence of inducement.

singular "agent" of the government, rather than in the plural to "agents of the government," and by failing to instruct the jury that inducement could come either directly from a government agent or indirectly "by using a private citizen as either a knowing or unwitting middleman." DiGirolamo's theory here, apparently, is that the government communicated inducements to him not only through the CI but also through Khan, and that the jury should have been instructed that they could find inducement as a result of the actions of either the CI or Khan.

■ DiGirolamo's requested charge that the CI was a government agent as a matter of law was unnecessary in this case. The CI admitted at trial that he was a DEA informant, and DiGirolamo's counsel stated in summation—and the government never argued to the contrary—that the CI was an agent of the government. There is no possibility that the jury misunderstood or mischaracterized the CI's relationship to the government. As a result, the district court did not err in omitting DiGirolamo's requested language, and even if such an omission were error, the error would clearly be harmless.

■ The omission of DiGirolamo's requested instruction on indirect inducement also was not error. We recognized the possibility of indirect inducement in *United States v. Valencia*, where we stated:

> If a person is brought into a criminal scheme after being informed indirectly of conduct or statements by a government agent which could amount to inducement, then that person should be able to avail himself of the defense of entrapment just as may the person who receives the inducement directly.

645 F.2d at 1168. The record in this case, however, is devoid of any evidence that Khan induced DiGirolamo by "soliciting, proposing, initiating, broaching or suggesting the commission of the offence charged." *United States v. Dunn*, 779 F.2d 157, 158 (2d Cir. 1985) (internal quotation marks and citation

omitted). The discussions that initiated the offense were between DiGirolamo and the CI, not between DiGirolamo and Khan. DiGirolamo's conversation with Khan is only relevant to the issue of whether DiGirolamo was predisposed to commit the offense, and as to that question, we have already stated that there was sufficient evidence for the jury to find predisposition.

■ Although DiGirolamo was entitled to have the court charge the jury on any defense theory for which a foundation existed in the record, he was not necessarily entitled to have that instruction communicated to the jury in the language of his choice. *United States v. Johnson*, 994 F.2d 980, 988 (2d Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 418, 126 L.Ed.2d 364 (1993). "Rather, a charge is sufficient if it adequately appraises the jury of the crime and the defense." *Id.* (citations omitted). Because the district court's instruction on entrapment accurately informed the jury of the elements of DiGirolamo's defense, we reject DiGirolamo's claim of error.

### 2. The Travel Act as a "Felony Drug Offense"

DiGirolamo's conviction for drug offenses involving more than one kilogram of heroin carried a statutory penalty of ten years to life imprisonment. 21 U.S.C. § 841(b)(1)(A) (1988 & Supp.1991). The statute, however, also called for a mandatory sentence of life imprisonment for offenders who commit such offenses "after two or more prior convictions for a felony drug offense have become final." *Id.* A "felony drug offense" was defined, *inter alia*, as "an offense that is a felony under any provision of this subchapter or any other Federal law that prohibits or restricts conduct relating to narcotic drugs, marihuana, or depressant or stimulant substances." *Id.*[4]

In finding that DiGirolamo had two prior convictions for felony drug offenses, the district court first relied upon a 1984 federal conviction for aiding and abetting the distribution of cocaine, a conviction that, DiGirola-

4. This definition was stricken from section 841(b)(1)(A) in 1994. *See* 21 U.S.C.A. § 841(b)(1)(A) (West 1995) (available on Westlaw). We express no opinion as to how this amendment might affect future cases similar to DiGirolamo's.

mo concedes, plainly meets the definition of a felony drug offense. As to the second felony drug offense, the district court relied upon DiGirolamo's 1987 conviction under the Travel Act, 18 U.S.C. § 1952(a) (1986), for interstate travel in aid of the distribution of a controlled substance. DiGirolamo contends on appeal that this reliance was improper.

The Travel Act, as it read at the time of DiGirolamo's offense, provided:

> Whoever travels in interstate or foreign commerce uses any facility in interstate or foreign commerce, including the mail, with intent to—
>
> (1) distribute the proceeds of any unlawful activity; or
>
> (2) commit any crime of violence to further any unlawful activity; or
>
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
>
> and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

18 U.S.C. § 1952(a) (1986). "Unlawful activity" under the Travel Act included "any business enterprise involving ... narcotics or controlled substances...." 18 U.S.C. § 1952(b)(1) (1986).

■ By its own terms, then, the Travel Act was, in the language of § 841(b)(1)(A) as it applied to DiGirolamo, a statute "that prohibits or restricts conduct relating to narcotic drugs, marihuana, or depressant or stimulant substances." 21 U.S.C. § 841(b)(1)(A) (1988 & Supp.1991). To be sure, the Travel Act encompassed, and continues to encompass, more than drug-related conduct. But "[t]he mere fact that the Travel Act outlaws other forms of criminal interstate travel does not mean it is not also, in appropriate cases, a law relating to controlled substances." *Johnson v. INS*, 971 F.2d 340, 342 (9th Cir. 1992). Since DiGirolamo specifically pleaded guilty to interstate travel in furtherance of trafficking in a narcotic substance, there can be no question that this is such an "appropriate" case. Thus, DiGirolamo's conviction under the Travel Act was a conviction for a felony drug offense.

■ DiGirolamo also contends, however, that his guilty plea to the Travel Act violation may not constitutionally be used to enhance his sentence.[5] In conclusory fashion, he argues that the plea was not entered knowingly and voluntarily in that he did not know at the time of the plea that he was pleading guilty to a drug offense. This claim is easily dispatched. The terms of DiGirolamo's plea and the discussion between the district court and counsel at sentencing for his Travel Act conviction make it perfectly clear that DiGirolamo knew he was pleading guilty to an offense involving conduct related to the distribution of a controlled substance.

■ But perhaps DiGirolamo means to argue that his plea was not knowing and voluntary in that he was not informed prior to entering the plea that the conviction might be treated as a felony drug offense in a separate sentencing for a later offense. This argument is also unavailing. We have held that "[c]ertain possible consequences of a guilty plea are 'collateral' rather than direct" and that these "need not be explained to the defendant in order to ensure that the plea is voluntary." *United States v. United States Currency*, 895 F.2d 908, 915 (2d Cir.1990)

---

5. Relying on the Supreme Court's decision in *Custis v. United States*, —— U.S. ——, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994), and our decision in *United States v. Jones*, 27 F.3d 50, 52 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 377, 130 L.Ed.2d 327 (1994), the government contends that DiGirolamo may not collaterally challenge the validity of a prior conviction, which is used to enhance his present sentence, on any ground except ineffective assistance of counsel at the prior conviction. Unlike the defendants in *Custis* and *Jones*, however, DiGirolamo was sentenced under provisions of Title 21 that expressly permit defendants to raise collateral challenges to prior convictions that the government intends to use to enhance the defendant's sentence. 21 U.S.C. §§ 851(b), 851(c)(1). *Custis* and *Jones* therefore are not controlling. It may be that DiGirolamo failed to adhere to the procedural steps required by §§ 851(c)(1)–(2) for presenting collateral challenges. The government does not so argue, however, and so we will assume that DiGirolamo's collateral challenge was properly raised.

(citations omitted). Other circuits have reached the same result. *See, e.g., United States v. Edwards,* 911 F.2d 1031, 1035 (5th Cir.1990). We have also held that whether a consequence of a plea is direct or collateral depends on whether the undesired consequence is "definite, immediate, and largely automatic." *United States Currency,* 895 F.2d at 915 (internal quotations omitted). That a defendant who is charged with a drug offense may later commit another drug offense, the penalty for which would be enhanced as a result of the original offense, is certainly a foreseeable possibility. But it is neither definite, immediate, nor largely automatic; hence, the defendant need not be told of this possible consequence in his original plea colloquy. *See King v. Dutton,* 17 F.3d 151, 153 (6th Cir.1994); *United States v. Brownlie,* 915 F.2d 527, 528 (9th Cir.1990); *Edwards,* 911 F.2d at 1035.

We conclude that the district court was correct in treating DiGirolamo's Travel Act conviction as a prior felony drug conviction, and that a sentence of life imprisonment was therefore required by statute.[6]

### III. CONCLUSION

We have fully considered DiGirolamo's remaining arguments and find them to be without merit. Accordingly, the judgment of conviction and the sentence imposed by the district court are affirmed.

---

**6.** Because the district court properly imposed a life sentence under 21 U.S.C. § 841(b)(1)(A), we need not address DiGirolamo's contention that the district court erred in holding, in the alternative, that DiGirolamo was a career offender subject to a term of life imprisonment under the Sentencing Guidelines.