19-3363-cr
United States v. Cabrera

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2020
No. 19-3363-cr


UNITED STATES OF AMERICA,
Appellee,


v.


JOHN E. CABRERA,
Defendant-Appellant.


ARGUED: SEPTEMBER 15, 2020
DECIDED: SEPTEMBER 8, 2021


Before:      JACOBS, LYNCH, SULLIVAN, Circuit Judges.

John Cabrera appeals from the judgment of the United States District

Court for the Southern District of New York (Failla, J.) convicting him of four

counts of distributing and possessing with intent to distribute fentanyl.  On

appeal, Cabrera argues that the jury instruction misstated the burden on the

inducement element of his entrapment defense, and that the district court abused

its discretion by admitting a special agent's opinion that Cabrera was an experienced drug dealer. The effect of these two errors was reciprocal.

We VACATE and REMAND for a new trial.

JUDGE SULLIVAN dissents in the Court's opinion, and files a dissenting opinion.

_____

DANIEL HABIB, Federal Defenders of New York, New York, NY, for Defendant-Appellant John Cabrera.

DANIELLE R. SASSOON, Assistant United States Attorney (Dominic Gentile, Rebekah Donaleski, Thomas McKay, Assistant United States Attorneys, on the brief), United States Attorney's Office for the Southern District of New York, New York, NY, for Appellee.

DENNIS JACOBS, Circuit Judge:

John Cabrera engaged in four drug transactions with his barber, who was a government informant. Cabrera's sole defense was entrapment, which (as the district court acknowledged) was a close call as to the element of inducement. He appeals chiefly on the grounds that: the charge misstated his burden by requiring the defendant to *establish* that the government initiated the crime; and that testimony from a special agent, who opined that Cabrera was an

2

experienced drug dealer, was inadmissible as lay opinion under Federal Rule of Evidence 701.

Cabrera and his barber gave opposite accounts of who first proposed partnering in the drug trade. It was therefore crucial that the charge accurately state Cabrera's burden: the slight burden of adducing "some credible" evidence that the government initiated the crime. The charge overstated that burden, effectively requiring that the jury weigh the evidence and definitively accept Cabrera's account as a precondition to considering predisposition.

Compounding the prejudice to Cabrera's defense, the special agent's testimony that Cabrera was an "experienced" drug dealer was inadmissible as lay opinion. And it undercut Cabrera's account of how the transactions with his barber originated, as well as his lack of predisposition to deal.

We vacate Cabrera's conviction and remand for a new trial.

## I

Cabrera is a legal permanent resident who came to New York from the Dominican Republic in 2013, when he was 20. After arriving, Cabrera held

3

several minimum-wage jobs before becoming a carpenter. Around 2014, he met a barber and fellow Dominican immigrant named Marcos. Cabrera's apartment was located near the barbershop where Marcos worked, and Cabrera began visiting him weekly for a shave and haircut.

Marcos had immigrated to the United States in 1992 when he was 17; but in 2001 he was deported after serving a sentence on a drug conviction. He reentered illegally that same year. In 2016 Marcos became a paid informant for the Drug Enforcement Administration ("DEA"). He received cash payments and deportation deferrals renewed annually so long as he remained an informant. (Put another way, Marcos was compensated and deferred so long as he was useful, that is, so long as he had people on whom he could inform.)

Over a two month period in late 2017, Cabrera and Marcos partnered to sell drugs. Cabrera delivered pills containing fentanyl, and Marcos, under the DEA's direction, paid Cabrera and pretended to resell the pills to customers in North Carolina. There were five transactions. On September 7, Cabrera gave Marcos a small free sample. Six days later, Cabrera sold Marcos 200 pills for $3,000; a week later, 198 pills for $3,000; and another six days later, 397 pills for

4

$3,000 up front and $3,000 in two days. Following a month-long gap, they met again on October 27 to exchange 1,000 pills for $15,000, and agents arrested Cabrera; he had 1,100 pills on him.

The government charged Cabrera in a four-count indictment. Counts I and II were for distributing and possessing with intent to distribute fentanyl on September 13 and 21 in violation of 21 U.S.C. §§ 812, and 841(a)(1) and (b)(1)(C). Counts III and IV were for distributing and possessing with intent to distribute 40 grams or more of fentanyl on September 27 and October 27 in violation of 21 U.S.C. §§ 812, and 841(a)(1) and (b)(1)(B). At trial, Cabrera and Marcos gave sharply divergent testimony about how their partnership began.

Cabrera--conceding he sold the pills to Marcos--claimed he was entrapped. He testified as follows. Marcos asked him several times during barbershop visits to supply drugs; Cabrera refused, telling Marcos he already made sufficient money as a carpenter. But Marcos renewed his invitation approximately five or six times until, in early 2017, Cabrera relented, having become desperate after losing his job, girlfriend, and apartment--and confiding his problems to Marcos. Cabrera began searching for a supplier; after six months, he found one at a

5

nightclub, and told Marcos that he was ready: Cabrera would serve as the middleman, earning $2 from the supplier for each pill that he sold to Marcos, who would then resell to (fictitious) customers in North Carolina.

Marcos's version of events, as follows, was different in every material respect. Marcos first learned in 2016 that Cabrera dealt drugs when Cabrera told him that his supplier had unfortunately been arrested. At that point, Cabrera and Marcos had known each other for eight months. Cabrera then disappeared for a year, during which time Marcos became an informant. When Cabrera returned to the barbershop in September 2017, he told Marcos that he was back in business. Cabrera was looking to sell oxycodone pills and asked Marcos if he knew any buyers. When Marcos said that he knew some in North Carolina, Cabrera proposed that the two do business together. Marcos promptly contacted his handlers at the DEA.

Trial evidence included government recordings of meetings and phone calls between Cabrera and Marcos, all of which post-date the agreement to partner. Cabrera boasted of his experience selling drugs, telling Marcos, for example, that "with me there will always be many good things," and "I'm only

6

24 . . . but I'm not new at this." App'x 80–81. Cabrera and Marcos occasionally pushed each other to do bigger deals. At their second meeting (their first sale), Marcos voiced frustration at being unable to buy pills in greater bulk; and soon after, over the phone, Cabrera expressed disappointment about how long it was taking to plan their next deal. On a call following their third meeting, Cabrera urged Marcos to visit North Carolina more frequently; when Marcos demurred, Cabrera offered to give him more pills on credit. Later, Marcos asked Cabrera to locate a pure form of heroine called China White, but this time it was Cabrera who declined.

Cabrera went silent after their September 29 meeting. He testified that he wanted to cut ties with Marcos because he regretted breaking the law and feared he was under DEA surveillance. Marcos left multiple voicemails throughout October, pushing Cabrera to resume deals. At the DEA's direction, Marcos showed up at Cabrera's workplace to ask where he had been (Marcos does not recall being wired on that occasion). On October 25 at the barbershop, they planned the fifth deal in an unrecorded meeting; according to Marcos, Cabrera

was scared he had been followed and insisted on increasing the deal to 1,000 pills.

Special Agent Daniel Son, who had surveilled Cabrera at the September 21 and 27 deals, also testified. Over Cabrera's objection, Agent Son opined on rebuttal that Cabrera, unlike the "average drug dealer," appeared to be "experienced" because he had employed countersurveillance driving techniques (which consisted of really bad driving). App'x 649. For support, Agent Son cited his experience conducting narcotics investigations.

After a six-day trial, the jury convicted Cabrera on all counts. Cabrera was sentenced to concurrent terms of 48 months' imprisonment on each count.

## II

The first issue is whether the jury instruction on Cabrera's entrapment defense contained error, specifically as to the element of inducement. "We review a jury instruction challenge de novo." United States v. Coppola, 671 F.3d 220, 247 (2d Cir. 2012) (citation omitted). "Instructions are erroneous if they mislead the jury as to the correct legal standard or do not adequately inform the

jury of the law." Hudson v. New York City, 271 F.3d 62, 67 (2d Cir. 2001) (quotation omitted).

## A

The affirmative defense of entrapment consists of "two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." Mathews v. United States, 485 U.S. 58, 63 (1988) (citations omitted). "[W]hen a defendant has presented credible evidence of inducement by a government agent, the government has the burden of proving beyond a reasonable doubt that the defendant was predisposed to commit the crime." United States v. Flores, 945 F.3d 687, 717 (2d Cir. 2019) (citing Jacobson v. United States, 503 U.S. 540, 548–49 (1992)).

That approach balances two considerations. The government may not manufacture crime where there would be none by "implant[ing] in the mind of an innocent person the disposition to commit the alleged offense and induc[ing] its commission . . . ." Jacobson, 503 U.S. at 553 (quoting Sorrells v. United States, 287 U.S. 435, 442 (1932)). At the same time, "stealth and strategy are necessary

9

weapons in the arsenal of the police officer."  Sherman v. United States, 356 U.S.

369, 372 (1958).  The entrapment defense thus seeks to protect the "unwary

innocent" while leaving room for investigative techniques that catch the

"unwary criminal who readily availed himself of the opportunity to perpetrate

the crime."  Mathews, 485 U.S. at 63 (quotation omitted).

The first element--inducement--is relatively straightforward.  It happens

when the government has "initiated the crime."  United States v. Brand, 467 F.3d

179, 190 (2d Cir. 2006) (quoting United States v. Mayo, 705 F.2d 62, 67 (2d Cir.

1983)).  More broadly, inducement covers "soliciting, proposing, initiating,

broaching or suggesting the commission of the offence charged."  United States

v. Sherman, 200 F.2d 880, 883 (2d Cir. 1952) (Hand, I.).  The degree of pressure

exerted, and the type, are matters that bear mainly on the element of

predisposition.  United States v. Dunn, 779 F.2d 157, 158 (2d Cir. 1985); United

States v. Pugliese, 346 F.2d 861, 863–64 (2d Cir. 1965); see also United States v.

Mayfield, 771 F.3d 417, 437 (7th Cir. 2014) ("The nature of the government

inducement is significant chiefly as evidence bearing on predisposition."

(quotation omitted)).

10

We have long held that the jury instruction on inducement should not specify a burden of proof; it should require only "some" or "credible" evidence the government initiated the crime. United States v. Braver, 450 F.2d 799, 805 (2d Cir. 1971) (Feinberg, J.); United States v. Valencia, 645 F.2d 1158, 1166 (2d Cir. 1980); United States v. Groob, 451 F.2d 1210, 1210–11 (2d Cir. 1971).

At the same time, we have previously characterized the defendant's burden to establish inducement as a burden of proof by a preponderance. United States v. Williams, 23 F.3d 629, 635 (2d Cir. 1994); see also Braver, 450 F.2d at 802. We now recognize that this "preponderance" burden is inconsistent with the jury instruction we have endorsed. As our sister circuits recognize, a "some evidence" instruction on inducement communicates a burden of production, not one of persuasion. See, e.g., Mayfield, 771 F.3d at 440; United States v. Isnadin, 742 F.3d 1278, 1297 (11th Cir. 2014); United States v. Gurolla, 333 F.3d 944, 955 (9th Cir. 2003). And in this Circuit, "some evidence" describes a burden of production in the context of burden shifting. United States v. Archer, 671 F.3d 149, 173–74 (2d Cir. 2011). "Some evidence" is evidence that is

11

detected or recognized--without being weighed, as would be needed to find a thing by a preponderance.

Similarly, we have sometimes conflated the defendant's burden to obtain an entrapment charge with the defendant's burden at trial. Brand characterized the burden at trial as a preponderance of the evidence, but a burden that is nonetheless "relatively slight." 467 F.3d at 190 (quoting Mayo, 705 F.2d at 67). That caveat, however, derived from United States v. Henry, in which the issue was whether the defendant was entitled to an entrapment charge at all. 417 F.2d 267, 269–70 (2d Cir. 1969). This conflation arose here: the government argued to the district court that "some evidence is really, goes more to whether they meet their threshold for getting the jury instruction." App'x 688.

In light of this confusing – and inconsistent – case law describing the defendant's burden to establish inducement, we now reconsider the burden that a defendant bears at trial and the proper jury instruction that should accompany it.

We hold that the defendant has the burden to produce "some credible" evidence--but need not prove by a preponderance of the evidence--that the

12

government induced him to commit the crime. This formulation best aligns with much of our recent precedent and eliminates any conflict with the language we have previously endorsed in jury instructions. See Flores, 945 F.3d at 717 (citing Jacobson, 503 U.S. at 548–49); United States v. Kopstein, 759 F.3d 168, 174 (2d Cir. 2014) (citing United States v. Bala, 236 F.3d 87, 94 (2d Cir. 2000)); see also United States v. Salerno, 66 F.3d 544, 547 (2d Cir. 1995). Compared to a "some evidence" instruction, the phrase "some credible evidence" makes explicit what is implicit-- that a jury need not consider evidence it finds unworthy of credit or belief.[1]

By definition, "some credible" evidence suggests a burden of production. And, as a matter of administration, requiring a jury to apply two different burdens of proof to a single defense would "tend[] to distract the jury from the real issue and may result in the imposition of too heavy a burden on the defendant." Dunn, 779 F.2d at 160. "[T]he ultimate question basic to all claims of entrapment" is whether the defendant was "ready and willing to commit the

---

[1] This opinion has been circulated to all the judges of the Court prior to filing. See Jon O. Newman, In Banc Practice in the Second Circuit, 1984-1988, Brook. L. Rev. 355, 367–68 (1989) ("On occasion . . . a panel opinion is circulated prior to filing when the panel deems it important for the full court to be aware of what the panel proposes to say.").

offense if given an opportunity to do so." United States v. Martinez-Carcano, 557 F.2d 966, 970 (2d Cir. 1977). Predisposition--not inducement--is the "principal element" of entrapment. Mathews, 485 U.S. at 63 (quoting United States v. Russell, 411 U.S. 423, 433 (1973)). Inducement is merely the threshold inquiry for whether "the defense of entrapment is at issue." Jacobson, 503 U.S. at 549.

Traditionally, the defendant's burden on an affirmative defense, when the government has the ultimate burden of persuasion, is to produce evidence creating an issue of fact. See Archer, 671 F.3d at 173 (collecting examples). There is no reason to depart from that principle here. A defendant's prima facie case of inducement raises an issue of fact: whether the defendant "likely would have never run afoul of the law" but for the hand of the government. Jacobson, 503 U.S. at 549; see also Sherman, 356 U.S. at 376. The government must then justify its conduct, see Henry, 417 F.2d at 270, and undertake its proper burden to prove "beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents," Jacobson, 503 U.S. at 549.

14

**B**

The charge on Cabrera's entrapment defense implied that the jury could not consider predisposition unless it made a finding that the government "did initiate" the crime. That was legal error. In full and relevant part, the instruction referenced the proper standard ("any evidence") but deviated:

> You should first consider whether there is any evidence that the government, acting through the confidential informant, induced Mr. Cabrera to commit the offense you are considering by taking the first step that led to the criminal act. Inducement may include soliciting, proposing, initiating, broaching, or suggesting the submission of the offense. If you find that there is no evidence that the government induced Mr. Cabrera to commit the offense you are considering, then you should find that there was no entrapment and you need not consider this defense any further. If, on the other hand, you find that the government did initiate the offense you are considering, then you must decide whether the government has proven beyond a reasonable doubt that Mr. Cabrera was already predisposed to commit the offense.

App'x 807.

This instruction suggested that Cabrera had to satisfy a burden of proof. No matter what standard of proof the jury applied or intuited--whether it was a preponderance, beyond a reasonable doubt, or a standard from the jury's imagination--there was error. Cabrera was obliged to produce no more than

15

"some credible" evidence of inducement.  The error was considerable.  Only one

standard was referenced: the government's burden to prove predisposition

beyond a reasonable doubt.  The jury "would naturally infer . . . that was the

standard they were to apply, not only to the government but also to [Cabrera]."

Pugliese, 346 F.2d at 863 (quotation omitted).

The government effectively concedes this error, focusing instead on other

passages in the charge that purportedly conveyed the gist of defendant's "slight"

burden.  The government contends that the verb "did initiate" was "necessarily

defined by the preceding [instruction] to consider whether there is 'any evidence'

of inducement and to terminate the entrapment inquiry only if there is 'no

evidence' of inducement."  Appellee Br. 17.

However, the final two sentences left the jury with a dichotomy that

reinforced the charge's basic error: the jury could *either* (1) reject the entrapment

defense if "you find . . . no evidence" of inducement, *or* (2) move on to

predisposition if, "on the other hand," "you find that the government did

initiate" the offense.  That dichotomy has the natural tendency to confuse and

skew the jury's decision-making.

The government argues in the alternative that Cabrera forfeited his objection by not explicitly requesting the "some evidence" language. But Cabrera submitted a proposed instruction with that precise wording, and he later objected to the district court's proposal by asking the court to replace "find that" with "find evidence that." That is all counsel was required to do to "inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). Counsel need not pester the judge to preserve the objection.

### III

We also agree with Cabrera that the district court abused its discretion by admitting Special Agent Son's testimony as lay opinion. Agent Son testified that he believed Cabrera was an "experienced" drug dealer. His testimony was expert opinion, in violation of Federal Rule of Evidence 701.

We review the district court's evidentiary decisions for abuse of discretion. United States v. Garcia, 413 F.3d 201, 210 (2d Cir. 2005). "A district court abuses its discretion when it bases its ruling on an erroneous view of the law or on a

17

clearly erroneous assessment of the evidence, or renders a decision that cannot be located within the range of permissible decisions." United States v. Vayner, 769 F.3d 125, 129 (2d Cir. 2014) (quoting Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013)).

Rule 701 provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

The "specialized knowledge" restriction in Part (c) "prevent[s] a party from . . . conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in Fed. R. Crim. P. 16." Garcia, 413 F.3d at 215 (citing Fed. R. Evid. 701, Advisory Committee Note (2000)). "If the opinion rests in any way upon scientific, technical, or other specialized knowledge, its

admissibility must be determined by reference to Rule 702, not Rule 701." Id. (quotation omitted). Accordingly, lay opinion testimony is "limited to opinions that result from a process of reasoning familiar in everyday life." Flores, 945 F.3d at 707 (quoting United States v. Cuti, 720 F.3d 453, 457 (2d Cir. 2013)).

Agent Son testified that when Cabrera was driving to sell drugs to Marcos, Agent Son saw Cabrera "conducting countersurveillance"; that is, "[e]xcessively speeding, [making] erratic lane changes, making U turns and then making another U-turn, those types of maneuvers." App'x 648–49. Cabrera does not challenge that (seemingly unobjectionable) testimony.

Cabrera's challenge is focused on Agent Son's conclusion: that Cabrera was "experienced" as compared to the "average drug dealer":

> Q. In your experience was it unusual to see someone engaged in a drug transaction doing this?
>
> A. Yes. It's unusual.
>
> Q. And why was that?
>
> A. The average drug dealer does not know that they're being followed. They're [sic] don't do those type of techniques.
>
> Q. And based on what you saw, those--from those countersurveillance techniques, what conclusion did you draw?

19

A.  That the defendant was experienced to know that he knows some of our law enforcement techniques and to deploy those countersurveillance techniques, to lose us or lose the tail.

App'x 649.

Garcia is closely analogous.  We ruled that the district court abused its discretion in admitting a DEA agent's opinion that the defendant was a member of a drug conspiracy: the witness's "reasoning process was not that of an average person in everyday life; rather, it was that of a law enforcement officer with considerable specialized training and experience in narcotics trafficking."  413 F.3d at 216–17.

Likewise, Agent Son drew upon his specialized knowledge and experience as a DEA detective to infer that Cabrera was more experienced than your average drug dealer.  That is, Cabrera had done this frequently--testimony that, not coincidentally, had obvious bearing on Cabrera's entrapment defense.  Agent Son's opinion did not relate events, or describe Cabrera's atypical driving patterns, or contextualize the relationship between Cabrera and Marcos.  See id. at 213–14.  It was therefore an abuse of discretion to admit his testimony as lay opinion under Rule 701.  See also United States v. Figueroa-Lopez, 125 F.3d 1241,

1246 (9th Cir. 1997) (finding inadmissible under Rule 701 a law enforcement officer's testimony that the defendant's countersurveillance driving was consistent with that of an "experienced drug trafficker").

The government points out that a lay person could have reached the same conclusion as Agent Son--that Cabrera's driving was suspicious. But Agent Son went well beyond that; he inferred from Cabrera's driving that Cabrera must be one of those experienced drug-dealers who had mastered the technique of evading law enforcement. Cf. United States v. Grinage, 390 F.3d 746, 750 (2d Cir. 2004) (explaining that jurors were not "helped" within the meaning of Rule 701 by opinion testimony that, in addition to telling them "what was in the evidence," also told them "what inferences to draw from it").

Although a lay witness may in some circumstances call on special experience in aid of the witness's perceptive faculties, that is not the case here. Flores ruled that the district court was within its discretion in admitting a DEA informant's lay opinion that a substance was cocaine. 945 F.3d at 709. The witness's testimony was based on his experience working for a drug cartel and having examined the substance by smell, touch, and appearance. Id. at 708–09.

The district court had made clear that the witness was no expert and cabined his testimony; accordingly, the witness testified to whether he believed the substance was or was not cocaine based on practical tests of perception, rather than opining on its purity. Id.

Agent Son, however, reached his opinion through an opaque, intuitive process grounded in some kind of specialized knowledge as to how your average drug dealer typically behaves compared to a drug dealer who is experienced. A lay person is unfamiliar with law enforcement surveillance techniques and incapable of inferring that a suspect's driving maneuvers evince (1) experience with evading those techniques and, consequently, (2) experience dealing drugs. A juror might as easily ascribe those maneuvers to watching the movies, or to a paranoia born of inexperience.

**IV**

We must vacate and remand for a new trial. The error in the jury instruction and the improperly admitted testimony, considered together, prejudiced Cabrera's defense of entrapment--and he had no other.

Because Cabrera objected to the charge at trial and has raised the same claim on appeal, we review for harmless error. United States v. Botti, 711 F.3d 299, 308 (2d Cir. 2013) (citation omitted). We vacate when "there was a prejudicial error" in the charge viewed as a whole, assessing whether "it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." United States v. Atilla, 966 F.3d 118, 123–24 (2d Cir. 2020) (quoting United States v. Aina-Marshall, 336 F.3d 167, 170 (2d Cir. 2003) and Neder v. United States, 527 U.S. 1, 18 (1999)). We similarly review an evidentiary error for whether it substantially influenced the verdict, Garcia, 413 F.3d at 210 (quotations omitted); but because the errors had reciprocal effect--and the standards have no discernible difference--we consider whether the two together were harmless.

Harmlessness turns on whether it is clear Cabrera would have failed on his entrapment defense absent the errors; i.e., whether it is clear a rational jury would still have found: (1) that Cabrera presented no credible evidence of inducement, or (2) that the government proved predisposition beyond a reasonable doubt.

At trial, inducement was vigorously contested. Marcos and Cabrera gave dueling accounts of who initiated the venture. Marcos testified that Cabrera proposed selling drugs in a bid to revive Cabrera's drug-dealing business after losing his supplier and disappearing for a year. Cabrera testified that Marcos nagged him to sell drugs until Cabrera relented under personal and financial stress.

A properly instructed jury could easily have found that Cabrera put forth some credible evidence of inducement. It was Marcos's word against Cabrera's. Marcos had compelling needs to feed the government new drug dealers; and Cabrera impeached Marcos with records of phone calls between them during the year Marcos claimed Cabrera had disappeared. The district court itself was "in equipoise" "on the issue of who initiated the transactions." App'x 1083. A similarly dubious jury would necessarily have found at least some of Cabrera's testimony credible.

The government argues that the difference between the parties' proposed instructions on inducement was too fine to matter and that at one point the instruction referenced "any evidence" of inducement, a correct statement of the

24

law.  We rejected this argument in Part II.B; considering the entire instruction, the error was the non-trivial difference between burdens of production and persuasion.  The unusual feature of this case is that improper testimony reinforced the error's prejudicial effect.  Agent Son testified with the authority of a federal agent that he believed Cabrera was an "experienced" drug dealer, which necessarily invited the inference that Marcos's account of who initiated the crime was right, Cabrera's was wrong, and, further, that Cabrera was predisposed.  The testimony cleared the way for the jury to reject Cabrera's defense of entrapment with ease.

Nor is Cabrera's predisposition clear beyond a reasonable doubt.  To prove predisposition, the government may present evidence of, but not limited to, "(1) an existing course of criminal conduct similar to the crime for which [the defendant] is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement."  Flores, 945 F.3d at 717 (quoting Salerno, 66 F.3d at 547).

The government first contends that Cabrera was keen to do deals with Marcos. According to Marcos's testimony and recorded conversations, Cabrera gave Marcos a free sample before the first sale, told Marcos that "with me there will always be many good things," and gave similar assurances. App'x 80–81, 875, 892, 885. Cabrera also admitted at trial that he was eager to sell Marcos more pills more frequently after their first deal; eagerness which showed in the quick succession and increasing size of new deals, and Cabrera's wariness of surveillance. App'x 576–77.

But the government's argument is off target. What matters is Cabrera's "state of mind *prior* to" when they first broached transacting drugs. United States v. Cromitie, 727 F.3d 194, 208 (2d Cir. 2013) (emphasis in original); see Jacobson, 503 U.S. at 549 n.2 ("[T]he proposition that the accused must be predisposed prior to contact with law enforcement officers is . . . firmly established."). The government's evidence of eagerness lacks probative value as to Cabrera's state of mind at the time Marcos--in his capacity as informant--and Cabrera made contact. As the government acknowledged, its evidence "pick[s] up midstream" in Cabrera and Marcos's venture. App'x 771. And Cabrera (if he

26

is to be believed) had repeatedly refused to partner in drug deals even before they struck an agreement. It is therefore far from clear whether Cabrera's eagerness was "independent and not the product of the attention that the Government had directed at [him]." Jacobson, 503 U.S. at 550. The government's only evidence of a "prompt response" to an early solicitation was Marcos's disputed claim that Cabrera returned to the barbershop and proposed partnering in the drug business. United States v. Harvey, 991 F.2d 981, 993 (2d Cir. 1993).

The government also contends that it proved Cabrera's predisposition with evidence showing that he was an established drug dealer. The government cites: Cabrera's advice to Marcos on how to evade detection by (inter alia) speaking in code, avoiding police, changing phone numbers, and hiding drugs in hidden car compartments; Cabrera's touting of his experience selling drugs (as heard on the recordings); and Cabrera's possession of 1,104 pills when arrested even though Marcos had only agreed to buy 1,000, from which the government infers that Cabrera must have "had other drug customers to whom he was selling those pills." Appellee Br. 26.

27

We disagree. Most notably, the government could identify no other customers, even though it had visually surveilled Cabrera, collected historical cell-cite location and call information, and searched his phone post-arrest. Moreover, Cabrera's advice to Marcos was not the counsel of a mastermind; it could have been given by a novice. And the district court discounted Cabrera's boasts to Marcos as "puffery," explaining that:

> [I]t's been my experience that folks involved in drug trafficking do not discuss drug trafficking in the way that Mr. Cabrera did. . . . I can't say for sure whether he had other customers, but I don't necessarily think that the statements in the transcripts would give me reason to believe that he did, because a lot of them were said with a tone of voice and with language that suggested he was trying to puff himself up as a more established drug dealer.

App'x 1083. The district court was similarly unimpressed with the 100 extra pills Cabrera had at his arrest: "I can't say whether those were for others or for additional transactions with Marcos." App'x 1085.

Given how thin was the government's case, Agent Son's testimony was pivotal. By definition, an experienced drug dealer is predisposed. Without his testimony, the government's evidence clearly establishes only that Marcos was

28

Cabrera's customer, not "that [Cabrera] himself was in the trade [of selling narcotics]." Sherman, 356 U.S. at 375.

We must vacate. The errors prejudiced Cabrera's only defense in this case, and we cannot say with certainty that a rational jury would have rejected that defense and convicted him notwithstanding.

## CONCLUSION

We have considered the government's remaining arguments and found them to be meritless. For the foregoing reasons, we **VACATE** Cabrera's conviction and **REMAND** for a new trial**.**

RICHARD J. SULLIVAN, *Circuit Judge*, dissenting:

Although I agree with the majority that this Circuit's case law concerning the applicable standard for entrapment defenses has been a source of confusion, and I have no objection to the new standard announced today concerning the proper instructions for an entrapment defense, I cannot say that the district court's jury instruction here constituted error under even that new standard. Moreover, while I agree with the majority that Agent Son's testimony exceeded the permissible bounds of lay opinion testimony, I am equally convinced that the introduction of that testimony was harmless in light of the totality of the evidence presented at trial. For these reasons, I would affirm Cabrera's conviction in all respects.

As an initial matter, the majority is correct to point out that our prior cases have sown confusion regarding the burden of proof that a defendant bears in establishing inducement when asserting an entrapment defense. As a result, I am unopposed to the formulation of a new standard that will offer greater clarity to district courts and parties moving forward. For nearly 70 years, our Court has recognized that when a defendant asserts an affirmative defense of entrapment, "two questions of fact arise: (1) did the agent induce the accused to commit the

offence charged in the indictment," and "(2) if so, was the accused ready and willing without persuasion . . . to commit the offence." *United States v. Sherman*, 200 F.2d 880, 882 (2d Cir. 1952) (Hand, *J.*). "On the first question the accused has the burden; on the second the prosecution has it." *Id.* at 882–83. In the intervening seven decades, we have consistently recognized that the defendant's burden on the first question involves proving government inducement "by a mere preponderance of evidence." *United States v. Thomas*, 351 F.2d 538, 539 (2d Cir. 1965); *see also United States v. Brand*, 467 F.3d 179, 190 (2d Cir. 2006) (holding that "a defendant hoping to assert the entrapment defense bears the burden of establishing inducement by a preponderance of the evidence"); *United States v. Braver*, 450 F.2d 799, 803 (2d Cir. 1971) (determining that the "defendant's burden of proof [as to inducement] must be at least the 'preponderance' or 'more-likely-than-not' standard").

Nevertheless, we have also considered the struggle that juries may face in distinguishing between the defendant's burden of proving inducement "by a preponderance of the evidence" and the government's burden of proving predisposition "beyond a reasonable doubt." *Braver*, 450 F.2d at 803. And, recognizing that the shifting burdens may indeed be confusing, we have suggested

2

that "it would be preferable for the district courts of this [C]ircuit to use an entrapment charge that does not give to the jury two ultimate factual issues to decide on two different burdens of persuasion imposed upon two different parties." *Id.* at 805. In addition, because this Circuit's broad definition of inducement "requires so little evidence to satisfy the defendant's burden of proof," and since "production of 'some evidence' of government initiation almost always satisfies it," we have found "simplification of the charge on [entrapment] appropriate." *Id.* at 805; *see Sherman*, 200 F.2d at 883 (defining inducement to include "soliciting, proposing, initiating, broaching or suggesting the commission of the offence charged"). Accordingly, without replacing the preponderance standard – indeed, while confirming its continued viability – we have determined that "it will be enough to tell the jury that if it finds *some* evidence of government initiation of the illegal conduct, the [g]overnment has to prove beyond a reasonable doubt that the defendant was ready and willing to commit the crime." *Braver*, 450 F.2d at 805 (emphasis added); *see id.* at 804–05 (expressly declining to hold that an instruction describing the preponderance burden would constitute prejudicial error).

To focus and clarify the jury's analysis on entrapment, we now overrule by "mini *en banc*" our longstanding precedent requiring defendants to prove inducement by a preponderance of the evidence. *See Doscher v. Sea Port Grp. Sec., LLC*, 832 F.3d 372, 378 (2d Cir. 2016) (explaining that a three-judge panel may overrule prior decisions of this Court after "circulat[ing] its opinion among all active judges and receiv[ing] no objections to its filing"). In replacing that standard, we draw from past discussions about jury instructions in cases like *Braver* and announce that, going forward, a defendant seeking to assert an affirmative defense of entrapment "has the burden to produce 'some credible' evidence – but need not prove by a preponderance of the evidence – that the government induced him to commit the crime." Maj. Op. at 12–13. I have no particular objection to this new standard, and agree that it will likely provide welcome clarity to district court judges grappling with our conflicting precedents.[1]

---

[1] While the rule we adopt today is certainly clearer than the patchwork of cases it replaces, it is by no means the only way to effectuate a more coherent approach to the defense of entrapment. Another option might be to adopt one of the more demanding standards endorsed by our Sister Circuits. *See, e.g.*, *United States v. Bradfield*, 113 F.3d 515, 522 (5th Cir. 1997) (requiring defendants to make a "prima facie showing of both . . . lack of predisposition and true inducement by the government" to be entitled to a jury instruction on entrapment, at which point the burden shifts to the government to "prove beyond a reasonable doubt that the defendant was [pre]disposed"); *United States v. Mayweather*, 991 F.3d 1163, 1176 (11th Cir. 2021) (explaining that trial courts must first "determine if the defendant has met his initial burden of producing sufficient evidence of government inducement," and only if he meets this burden is he "entitled to have his defensive theory of the case put before the jury with appropriate instructions from the trial judge" and "the

But even under this new – and arguably less burdensome – standard, the district court's instruction was not, in my view, improper. As noted by the majority, the district court instructed the jury on Cabrera's entrapment defense as follows:

> You should first consider whether there is any evidence that the government, acting through the confidential informant, induced Mr. Cabrera to commit the offense you are considering by taking the first step that led to the criminal act. Inducement may include soliciting, proposing, initiating, broaching, or suggesting the submission of the offense. If you find that there is no evidence that the government induced Mr. Cabrera to commit the offense you are considering, then you should find that there was no entrapment, and you need not consider this defense any further. If, on the other hand, you find that the government did initiate the offense you are considering, then you must decide whether the government has proven beyond a reasonable doubt that Mr. Cabrera was already predisposed to commit the offense.

App'x at 806–07.

---

burden shifts to the government to prove the defendant's predisposition to commit the crime beyond a reasonable doubt"). Alternatively, to the extent we wish to maintain this Circuit's historically expansive notion of inducement – which "requires so little evidence" that "production of 'some evidence' of government initiation almost always satisfies it," *Braver*, 450 F.2d. at 805 – we might consider dispensing with an instruction on inducement altogether and simply allowing the district court to play a gatekeeping role with respect to the defendant's initial burden of production. By expressly assigning this threshold inquiry for entrapment to the district court alone, we would avoid any potential jury confusion over shifting burdens by "focus[ing] the jury's attention" *exclusively* "on the central issue presented by a claim of entrapment: Was the defendant ready and willing to commit the offense if given an opportunity to do so?" *United States v. Dunn*, 779 F.2d 157, 160 (2d Cir. 1995) (internal quotation marks omitted).

5

The majority insists that "[n]o matter what standard of proof the jury applied or intuited – whether it was a preponderance, beyond a reasonable doubt, or a standard from the jury's imagination – there was error," Maj. Op. at 15, since the court's instruction "effectively requir[ed]" the jury to "weigh the evidence and definitively accept Cabrera's account as a precondition to considering predisposition," *id*. at 3. But after reviewing the district court's jury instruction in its totality, I see no reason to presume that the instruction here required more of Cabrera than the production of "some credible" evidence. Maj. Op. 15; *see United States v. Ford*, 435 F.3d 204, 210 (2d Cir. 2006) ("We do not review portions of jury instructions in isolation, but rather consider them in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law." (internal quotation marks and alterations omitted)).

For starters, the district court's instruction did not state that Cabrera was required to prove inducement by a preponderance of the evidence; in fact, the instruction did not mention *any* burden with respect to inducement, as *Braver* advised was prudent. *See Braver*, 450 F.2d at 805; *Dunn*, 779 F.2d at 160 (explaining that references to "the defendant's burden of proof with regard to inducement . . .

6

tend[] to distract the jury from the real issue and may result in the imposition of too heavy a burden on the defendant"); *United States v. Valencia*, 645 F.2d 1158, 1166 (2d Cir. 1980), *amended*, 669 F.2d 37 (2d Cir. 1981) ("There is little risk that the jury will impose too great a burden on defendants if no burden is mentioned at all."). It is therefore incorrect to suggest that omitting a standard of proof as to inducement would cause the jury to "naturally infer" that it should apply the beyond a reasonable doubt standard "not only to the government but also to [Cabrera]." Maj. Op. at 15 (alteration in original). Certainly, the court's instruction did not expressly advise the jury that Cabrera had to show inducement "beyond a reasonable doubt" – the harm that cases like *Braver* and its progeny were most eager to avoid. *See Dunn*, 779 F.2d at 160.

Moreover, while the district court did not use the words "some credible evidence" in its instruction to the jury, the court actually reduced – if not eliminated – the risk that the jury would apply a standard higher than "some credible evidence" by first directing the jury to focus on whether the defendant put forth *any* evidence of inducement. App'x at 806. The charge next provided that if the jury found "no evidence," then – and, arguably, only then – could it

7

reject the defense without addressing the government's proof of predisposition, which clearly had to be established beyond a reasonable doubt. *Id.* at 807.

The majority's view that the district court's charge required the jury to "definitively accept Cabrera's account as a precondition to considering predisposition," Maj. Op. at 3, is thus far from the only plausible interpretation of the charge. To the contrary, the more natural reading of the charge would suggest a *lower* burden on Cabrera, permitting the jury to eschew a finding on predisposition only if it found *no* evidence of inducement. *Cf. United States v. Groob*, 451 F.2d 1210, 1210–11 (2d Cir. 1971) (rejecting the argument that a charge requiring "credible evidence" of inducement might have caused the jury to assume "the defense had to prove inducement beyond a reasonable doubt"). Finally, even if it could be argued that the court's jury instruction on inducement were somehow erroneous, any error would have been harmless because, as discussed in detail below, the government provided overwhelming evidence of Cabrera's predisposition to commit the crimes at trial.

The majority attempts to bolster its argument that the jury instruction at issue was not harmless by linking it to Agent Son's improper expert testimony inferring the extent of Cabrera's narcotics experience from his aberrant driving

8

maneuvers. *See* Maj. Op. at 22 (concluding that "[t]he error in the jury instruction and the improperly admitted testimony, considered together, prejudiced Cabrera's defense of entrapment"). I agree with the majority that it was improper for Agent Son to offer an opinion on Cabrera's experience as a drug dealer based merely on his observation of Cabrera's driving tactics. I also agree that this Court should apply the harmless error standard on appeal. But a review of the entire record demonstrates that the improper testimony – whether or not it is paired with the district court's entrapment instruction – "had no substantial influence on the jury verdict" and that any error was therefore harmless. *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005).

Agent Son's testimony was not the only – or even the strongest – evidence of Cabrera's predisposition. At trial, the government focused heavily on Cabrera's unfettered access to large quantities of drugs and his own statements made over the course of his dealings with his barber, Marcos, who was the government's confidential source. In recorded conversations, Cabrera bragged that he was "only 24 but . . . not new" to dealing drugs, App'x at 885, and alluded to "old customers" to whom he had been selling drugs for more than two years, *id.* at 987.

Other evidence introduced at trial bore this out. Cabrera displayed knowledge of tactics to avoid surveillance throughout his dealings with Marcos, instructing him on how to set up discrete meetings, hide drugs, change phones, and use codes in communications about drug deals. Cabrera also admitted during his testimony at trial that he had independently sought out a drug supplier who sold him wholesale quantities of fentanyl pills, which enabled him to offer Marcos "as many pills as he wanted." And Cabrera had access to other drugs, as evidenced by the fact that he provided Marcos with a sample of heroin and discussed a potential transaction involving a strong form of heroin that he claimed to have sold before.

The ease with which Cabrera located a supplier with unlimited amounts of fentanyl clearly supported a finding of predisposition, as does the fact that Cabrera readily took advantage of this apparently endless supply when he offered Marcos free samples of fentanyl and heroin in early transactions and proposed sales of hundreds or thousands of pills at more frequent intervals. Notably, at the time of his arrest, Cabrera had over 1,100 pills in his possession. All of this evidence showed that Cabrera was already experienced in selling drugs when he began transacting with Marcos and that Cabrera obviously hoped to sell greater

10

quantities over time, thoroughly demonstrating his predisposition to sell drugs. *See United States v. Salerno*, 66 F.3d 544, 547 (2d Cir. 1995) (explaining that "predisposition may be shown by evidence of . . . an existing course of criminal conduct similar to the crime for which the defendant is charged," or "a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement" (internal quotation marks and alterations omitted)).

In assessing harmlessness, we consider "the overall strength" of the government's case, the importance of the improperly admitted testimony, "the prosecutor's conduct with respect to" such testimony, and whether that evidence "was cumulative of other properly admitted evidence." *Garcia*, 413 F.3d at 217. In light of the substantial evidence supporting the government's case against Cabrera, Agent Son's inadmissible opinion borders on the trivial. Indeed, while the government cited other parts of Son's testimony in its summation, it barely discussed his description of Cabrera's countersurveillance driving and the inferences to be drawn therefrom.[2] The government relied much more heavily on evidence of Cabrera's prior drug-dealing experience that was entirely

---

[2] When transcribed, the government's closing argument spanned approximately 43 pages and over 1,000 lines of text. [**A712–41, 765–779.**] Less than 10 lines of that entire summation discussed Agent Son's testimony about Cabrera's countersurveillance techniques. [**A732, 768.**]

11

independent from Son's opinion testimony, including Cabrera's own statements and actions reflecting his familiarity with dealing drugs and evading law enforcement and his easy access to a large supply of drugs.

Moreover, although Agent Son should not have been permitted to offer *expert* opinion testimony based on his observations of Cabrera's driving tactics, the jury was certainly free to draw its own inferences when assessing Agent Son's properly admitted observational testimony. Specifically, Agent Son testified that he personally observed Cabrera "excessively speeding, [making] erratic lane changes, making U[-]turns and then making another U-turn." App'x at 649. The majority's attempt to dismiss such maneuvers as nothing more than "really bad driving," Maj. Op. at 8, is entirely unpersuasive; indeed, we have long recognized that such evasive driving techniques are highly probative of criminal knowledge and intent, *see United States v. Vasquez*, 634 F.2d 41, 42–43 (2d Cir. 1980) (finding a "reasonabl[y] objective basis" to believe that defendants were engaged in illegal conduct where they engaged in "peculiar" conduct including circling the block, signaling to turn in one direction and then abruptly turning in the other, and glancing in the rearview mirror); *see also United States v. Terry*, 718 F. Supp. 1181, 1183–85 (S.D.N.Y. 1989), *aff'd*, 927 F.2d 593 (2d Cir. 1991) (noting that defendants'

12

"erratic and evasive driving away from a building under police surveillance for drug activity," making U-turns, driving "somewhat fast," and changing lanes, supported a " reasonable suspicion" of criminal activity).

So while it was not proper for Son to offer opinion testimony concerning the extent of Cabrera's drug-dealing experience based on his observations of Cabrera's driving, the jury was certainly free to draw common-sense inferences about Cabrera's intent and predisposition on its own. *See Hygh v. Jacobs*, 961 F.2d 359, 364–65 (2d Cir. 1992) (finding harmless error where an expert witness's "impermissible testimony was expressed within a larger body of otherwise unobjectionable testimony concerning police procedures involving violent arrestees from which the jury could easily have drawn the same conclusions that [the witness] did"); *see also United States v. Duncan*, 42 F.3d 97, 103 (2d Cir. 1994) (similar). Indeed, it was the obviousness of the inference that made the expert testimony improper in the first place. *See United States v. Boissoneault*, 926 F.2d 230, 233 (2d Cir. 1991) (noting that under the Federal Rules of Evidence, "a conclusion that the jury could just as easily have drawn for itself based on its own knowledge

13

or experience is subject to exclusion"). We have rarely tossed a guilty verdict over stray testimony of this sort, and I see no reason to do so here.[3]

* * *

In sum, I am convinced that (1) the district court's jury charge was wholly consistent with this Circuit's prior precedent and the new standard for entrapment announced today; (2) any conceivable error in the charge would have been harmless in any event, given the formidable evidence of Cabrera's predisposition to sell drugs; and (3) Agent Son's opinion testimony, while improper, was likewise harmless in light of that overwhelming evidence introduced at trial. I would therefore affirm the district court's judgment of conviction.

---

[3] *See, e.g.*, *United States v. Winick*, 792 F. App'x 91, 95 (2d Cir. 2019) (concluding that any error was harmless where the government elicited improper witness testimony and referred to that testimony at summation, but "offered substantial admissible evidence" at trial and "relied heavily on admissible evidence" in summation); *United States v. Londono-Tabarez*, 121 F. App'x 882, 884–85 (2d Cir. 2005) (determining that the district court erred in admitting expert testimony from a DEA agent who "de-code[d] certain statements" about drug transactions, but deciding upon examination of the "whole record" – including the defendant's non-credible testimony – that the error was harmless (quotation marks omitted)).

14